## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

OPTUM, INC.; OPTUM RX, INC.; DIVVYMED, LLC; GENOA HEALTHCARE, LLC; OPTUM FRONTIER THERAPIES, LLC; OPTUM FRONTIER THERAPIES II, LLC; OPTUM INFUSION SERVICES 305, LLC; OPTUM INFUSION SERVICES 550, LLC; OPTUM INFUSION SERVICES 553, LLC; OPTUM PHARMACY 700, LLC; OPTUM PHARMACY 701, LLC; OPTUM PHARMACY 702, LLC; OPTUM PHARMACY 704, LLC; OPTUM PHARMACY 705, LLC; OPTUM PHARMACY 801, LLC,

*Plaintiffs,*

v.

RODNEY RICHMOND, BRIAN JOLLY, DEBBIE MACK, LENORA NEWSOME, CLINT BOONE, WALTER LYN FRUCHEY, HAROLD H. SIMPSON, *and* BETH ANN DAVENPORT, *in their official capacities as board members of the Arkansas State Board of Pharmacy*; and JOHN C. KIRTLEY, *in his official capacity as executive director of the Arkansas State Board of Pharmacy*,

*Defendants.*

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 16 2025

TAMMY H. DOWNS, CLERK
By:_____
DEP CLERK

Case No. 4:25-cv-598-LPR

This case assigned to District Judge __Rudofsky__
and to Magistrate Judge __Harris__

## COMPLAINT

**INTRODUCTION**

1.      This lawsuit challenges the legality of a recent Arkansas law known as "Act 624," which bans pharmacies that are affiliated with pharmacy-benefits managers ("PBMs") from obtaining state pharmacy permits.  In becoming the only state in the nation to adopt this kind of restriction, Arkansas placed the admitted financial interests of its local pharmacies over the clear health interests of its residents.  The law's short-sighted attempt to shield local pharmacies from out-of-state competition will reduce access to mail-order and specialty medications by seniors, residents of rural communities, and people with severe mental health and complex medical conditions—all while increasing the costs of prescription drugs for residents throughout the state. Act 624 is also as unlawful as it is unwise.  Indeed, it is preempted and unconstitutional four times over.  Plaintiffs (together, "Optum") bring this action to prevent Act 624 from taking effect on January 1, 2026.

2.      Act 624's protectionist aims were no closely guarded secret.  On the contrary, the legislators who supported it openly admitted that it is designed to protect local pharmacies from competition by out-of-state mail-order pharmacies, which typically are affiliated with PBMs.  To be sure, legislators also voiced concerns that PBMs have engaged in "anti-competitive tactics." But Arkansas law already forbids PBMs from engaging in those very tactics.  And, in truth, it is Act 624 that is *directly* anti-competitive by foreclosing entire channels of competition from pharmacies that are affiliated with PBMs.  The state's own fiscal-impact statement concerning Act 624 admits that prices will rise "as less competition would likely drive less favorable rates."

3.      Despite the heated anti-PBM rhetoric that accompanied Act 624, market conditions and empirical evidence show that PBMs play a critical role in providing lower-cost prescription drugs to millions of Americans.  Health plans partner with PBMs to negotiate lower drug costs by leveraging their collective-bargaining power, while ensuring that patients timely receive

2

medications that are safe and effective. A recent study published by the National Bureau of Economic Research described PBMs as "a procompetitive force" responsible for billions of dollars in annual savings.

4. PBMs achieve these benefits through a variety of mechanisms. For example, they can negotiate reimbursement rates with pharmacies and pass those savings on to health-plan sponsors and their members. Because PBMs typically represent multiple health plans, they can negotiate volume discounts with drug manufacturers far beyond what any individual plan could secure. PBMs also design and maintain networks of pharmacies to ensure that needed drugs are readily available and affordable to PBMs' clients and their members. And PBMs commonly are affiliated with pharmacies themselves. Most large PBMs are affiliated with both (1) mail-order pharmacies that can leverage nationwide economies of scale to reduce prices and ship prescription drugs directly to patients' doors—substantially enhancing patients' convenience and medication adherence—and (2) brick-and-mortar pharmacies, particularly when close contact with patients is needed to serve at-risk populations.

5. Optum Rx, Inc. ("Optum Rx") has performed these PBM services for years, including in Arkansas. Optum Rx administers prescription-drug benefits for millions of Americans, including nearly 440,000 Arkansans, and provides PBM services to health plans nationwide, including employee-benefit plans offered by large national employer, unions, trusts, and governmental entities. Those plans are often governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), including scores of plans in Arkansas. Optum Rx also provides services to numerous Arkansas Medicare Part D plans, which are tightly regulated by Title XVIII of the Social Security Act. Additionally, Optum-affiliated pharmacies annually assist with

3

dispensing nearly one million prescriptions to Arkansans, including to 38,000 Arkansas patients thus far in the first quarter of 2025. Over 22,000 of those patients are Medicare beneficiaries.

6.      Optum Rx helps achieve the goals of both Medicare and ERISA by simplifying the pharmacy experience for patients, establishing nationally uniform procedures, and helping patients save on medication costs through nationwide economies of scale. On average, Optum Rx's clients' members save $1,600 per year on their medications from Optum Rx's negotiated network discounts and clinical tools. Optum-affiliated pharmacies routinely fill beneficiaries' prescriptions through their mail-order operations, which ship drugs from around the United States directly to residents' doors. Optum also provides "specialty drugs"—drugs that require special handling and patient education, are often used to treat acute, chronic, and rare diseases, and can be prohibitively expensive to procure, store, and dispense. As a result of these benefits, plan sponsors often choose to offer beneficiaries access to PBM-affiliated pharmacies because they provide high-quality services at a lower cost.

7.      Optum's wholly owned subsidiary, Genoa, also operates eleven brick-and-mortar pharmacies throughout Arkansas. Genoa's pharmacies are located in community mental-health centers and Federally Qualified Health Centers that specialize in treating severe mental-health issues like schizophrenia and major depressive disorder. In many cases, traditional brick-and-mortar pharmacies cannot deliver the medications and care needed to treat these mental-health issues. By contrast, Genoa can readily acquire the needed drugs and distribute them through easy-to-use proprietary packaging, helping to ensure medication adherence. Genoa pharmacists are also specially trained in handling mental-health disorders and routinely interact with their patients to ensure that each patient's combination of medications is safe and effective.

4

8.      Act 624 poses direct and substantial harms to Optum.  It strips eligibility for pharmacy permits from pharmacies in which PBMs hold a "direct or indirect interest."  Act 624 § 2(b), to be codified at Ark. Code Ann. § 17-92-416(b).  PBMs must divest from their pharmacies by the law's effective date—January 1, 2026—or lose the pharmacy permits they need to serve Arkansas patients.  As a result, Optum will be forced to sell off its Genoa pharmacies in a matter of months, or shut them down if it cannot find a qualified buyer.  And, because divesting from its out-of-state pharmacies and nationwide operations would be impracticable—and would only exacerbate Act 624's harmful consequences—Optum will be forced to discontinue virtually all of those businesses' specialty and home-delivery pharmacy services to Arkansas patients.

9.      Act 624's heavy-handed divestiture mandate is a marked outlier.  No other State has enacted such a draconian ban on PBM-affiliated pharmacies.  For good reason.  Act 624 will cause incalculable disruption to the lives of patients in Arkansas.  Because Act 624 flatly proscribes almost all PBM-*affiliated* pharmacies, Arkansas patients will be forced to find alternative pharmacies even if they are not themselves recipients of PBM services.  Act 624's sweeping prohibition will force thousands of Arkansans to abandon the safe and convenient services they have trusted for years and instead scramble to find substitute medications at locally owned, so-called independent pharmacies.  These independent pharmacies are unequipped to handle this influx, which is precisely why PBM-affiliated pharmacies have traditionally filled those gaps in the first place.   Act 624's divestiture mandate will also destroy national uniformity in the administration of Medicare benefits and ERISA plans, elevating new requirements applicable to Arkansas only.

10.      Such an extraordinary measure at the very least demands an extraordinary justification.  But the General Assembly candidly admitted in the Act itself and throughout the

5

legislative process that Act 624 was driven by naked economic protectionism. The only thing extraordinary about the General Assembly's justification is how openly the legislators who sponsored the Act shouted from the rooftops their unlawful goal of insulating local pharmaceutical interests from competition with out-of-state pharmacies.

11. The law's statement of purpose expressly admits that Act 624 was designed to protect "locally-operated pharmacies." The bill's supporters straightforwardly admitted these protectionist aims—in press conferences, podcasts, newspapers, and throughout the legislative debates. In the words of a key witness who testified in support of the law, Act 624 is designed to "grow the economy locally" by destroying "unfair competition" from "out-of-state mail order pharmacies." Such blatant protectionism is not a tactic the federal Constitution tolerates.

12. The law was also carefully tailored to insulate in-state businesses from its predicably adverse impacts. As originally drafted, the law targeted not only PBMs, but also "healthcare payors"—which would have disabled a large employer in Arkansas from owning pharmacies. After legislators objected, the "healthcare payor" language was excised though an amendment. The law was then amended again to exempt pharmacies that are "the sole Arkansas client" of a PBM. As a result, the law now targets out-of-state PBMs and affiliated out-of-state mail-order pharmacies, which are found *exclusively* in other states.

13. At times, the General Assembly tried to distract from its true aims by gesturing toward supposedly "anti-competitive" PBM behavior and protection of patient choice. But those alternative rationales are pretextual makeweights. In the first place, Act 624 *itself* is anti-competitive; it excises an entire class of competitors from Arkansas and removes choice for patients who would otherwise use PBM-affiliated pharmacies. The state's own fiscal-impact statement evaluating the law recognized as much, noting that "less competition would likely drive

6

less favorable rates" and thus increase drug prices for Arkansans. Moreover, the "anti-competitive" tactics the General Assembly accused PBMs of perpetrating are *already* illegal under Arkansas law. And the General Assembly heard testimony that the Arkansas Insurance Department found PBMs in compliance with those pre-existing legal requirements during its last audit. The General Assembly's alternative rationales are just fig leaves to cover the clear desire to harm out-of-state businesses.

14. This Court should invalidate Act 624's unwarranted and destructive divestiture mandate for four independent reasons.

15. *First*, Act 624 is preempted by ERISA. ERISA bars states from regulating central aspects of plan administration and enacting laws that disrupt national uniformity in plan administration. By design, Act 624 does both. The law will require plan sponsors who have designed their pharmacy networks around PBM-affiliated pharmacies to redesign and renegotiate those networks to comply with new, Arkansas-specific requirements. And by limiting which pharmacies health plans may use, Act 624 directly interferes with plan sponsors' network design—undermining national uniformity and transferring health-plan decisions from plan administrators to local legislators.

16. *Second*, Act 624 is preempted by Medicare statutes and regulations. To secure national uniformity in the administration of Medicare benefits, the Medicare Modernization Act codifies broad preemption of state laws that concern Medicare prescription-drug benefits. *See PCMA v. Wehbi*, 18 F.4th 956, 971 (8th Cir. 2021). Federal agencies, in turn, have promulgated numerous regulations governing precisely the subjects with which Act 624 seeks to interfere—from the delivery of prescription-drug benefits to beneficiaries, to the creation of pharmacy networks, to the negotiation of drug prices with pharmaceutical manufacturers, to beneficiary

claims processing. Indeed, one Medicare Part D regulation expressly contemplates the delivery of prescription drugs through "pharmacies offering home delivery via mail-order," 42 C.F.R. § 423.120(a)(3), and another requires Medicare Prescription Drug and Part D plans to admit "any willing pharmacy" to their networks. Yet Act 624 improperly purports to carve out a subset of such pharmacies—those affiliated with PBMs—from Medicare coverage.

17.    *Third*, Act 624 violates the dormant Commerce Clause. Laws that discriminate against out-of-state commerce on their face or in their purpose and effect are "per se invalid" and are subject to the "strictest scrutiny." *S.D. Farm Bureau, Inc. v. Hazeltine*, 350 F.3d 583, 597 (8th Cir. 2003). Act 624 is precisely such a discriminatory law. The law's declared purpose is to protect "locally-operated pharmacies," was carefully designed (and then modified) to ensure that its restrictions fall on out-of-state businesses, and was repeatedly described in protectionist terms throughout hours of testimony and debate in the General Assembly. Prohibiting such discrimination is "the 'very core' of [the Supreme Court's] dormant Commerce Clause jurisprudence." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023). Laws likewise violate the dormant Commerce Clause when they impose burdens on interstate commerce that are "clearly excessive in relation to the[ir] putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Here, Act 624's putative local benefits—aside from constitutionally forbidden protectionism—are non-existent. Legislators' unevidenced assertions notwithstanding, PBMs substantially *reduce* costs and enhance patients' access to needed drugs. Moreover, Act 624 addresses a problem that does not exist—allegedly unfair reimbursement of independent pharmacies. That is already proscribed by state law. The law's shaky foundations cannot justify its severe economic disruption and burdens on interstate commerce.

8

18. *Fourth*, Act 624 effects an unconstitutional taking of Optum's private property. If enforcement of Act 624 is not enjoined, Genoa will be forced to sell its eleven brick-and-mortar specialty pharmacies in Arkansas to non-PBM third parties, lest those pharmacies lose their licenses and thus any ability to serve their at-risk patients. Forcing a fire sale of these pharmacies to comply with Act 624's January 1, 2026 effective date will inevitably lead Optum to sell at a loss. That loss represents a *per se* taking of Optum's private property. Act 624 likewise effects a regulatory taking by stripping Optum of income streams that would continue to exist but for the law's enactment. And Arkansas has no mechanism, in Act 624 or elsewhere, to provide the constitutionally mandated just compensation for those economic injuries. The law therefore threatens a taking that only can be effectively remedied through prospective relief.

19. For those reasons, this Court should declare Act 624 preempted and unconstitutional and should enjoin the members of the Arkansas State Board of Pharmacy from taking any action to implement or enforce Act 624.

## PARTIES

20. Plaintiff Optum, Inc. is a healthcare company providing technology, pharmacy-care, and direct healthcare services. Optum, Inc. is incorporated in Delaware and has its principal place of business in Eden Prairie, Minnesota. Optum, Inc., is a subsidiary of UnitedHealth Group Inc. ("United"). All subsequently named Plaintiffs are subsidiaries of Optum, Inc. and are referred to herein, collectively, as Optum.

21. Plaintiff Optum Rx, Inc. is incorporated in California and has its principal place of business in Eden Prairie, Minnesota. This entity does business as Optum Rx, a PBM, throughout the United States, and in that capacity provides a full spectrum of pharmacy-care services to 65 million people across the Nation, including nearly 440,000 in the State of Arkansas. Optum Rx's pharmacy network includes more than 67,000 retail pharmacies and multiple home-delivery,

specialty, and compounding pharmacies.   Optum Rx, Inc. also operates a home-delivery and specialty pharmacy located in Overland Park, Kansas, which holds an Arkansas retail pharmacy permit.

22.    Plaintiff Genoa Healthcare, LLC is a Pennsylvania limited-liability company that has its principal place of business in Renton, Washington.  It operates retail pharmacies across the country, including eleven in the State of Arkansas.  All eleven of Genoa's Arkansas pharmacies hold Arkansas retail pharmacy permits.

23.    Plaintiff divvyMED, LLC is a Delaware limited-liability company that has its principal place of business in Moline, Illinois, where it operates a multi-dose pharmacy.

24.    Plaintiff Optum Frontier Therapies, LLC is a Michigan limited-liability company that has its principal place of business in Eden Prairie, Minnesota.  It operates a specialty pharmacy located in Flint, Michigan.

25.    Plaintiff Optum Frontier Therapies II, LLC is a Nevada limited-liability company that has its principal place of business in Eden Prairie, Minnesota.  It operates a specialty pharmacy located in Las Vegas, Nevada.

26.    Plaintiff Optum Infusion Services 305, LLC is a Delaware limited-liability company that has its principal place of business in Eden Prairie, Minnesota.  It operates infusion pharmacies located in Lenexa, Kansas and Baton Rouge, Louisiana.

27.    Plaintiff Optum Infusion Services 550, LLC is a Delaware limited-liability company that has its principal place of business in Eden Prairie, Minnesota.  It operates an infusion pharmacy located in Cincinnati, Ohio.

10

28.    Plaintiff Optum Infusion Services 553, LLC is a North Carolina limited-liability company that has its principal place of business in Eden Prairie, Minnesota. It operates an infusion pharmacy located in Raleigh, North Carolina.

29.    Plaintiff Optum Pharmacy 700, LLC is a Delaware limited-liability company that has its principal place of business in Eden Prairie, Minnesota. It operates a home-delivery and specialty pharmacy located in Oviedo, Florida.

30.    Plaintiff Optum Pharmacy 701, LLC is a Delaware limited-liability company that has its principal place of business in Eden Prairie, Minnesota. It operates a home-delivery pharmacy located in Mesa, Arizona.

31.    Plaintiff Optum Pharmacy 702, LLC is an Indiana limited-liability company that has its principal place of business in Eden Prairie, Minnesota. It operates a specialty pharmacy located in Jeffersonville, Indiana.

32.    Plaintiff Optum Pharmacy 704, Inc. is a Texas corporation that has its principal place of business in Eden Prairie, Minnesota. It operates a home-delivery and specialty pharmacy located in San Antonio, Texas.

33.    Plaintiff Optum Pharmacy 705, LLC is an Alabama limited-liability company that has its principal place of business in Eden Prairie, Minnesota. It operates specialty pharmacies located in Birmingham, Alabama; Franklin, Tennessee; and Columbus, Mississippi.

34.    Plaintiff Optum Pharmacy 801, Inc. is an Arizona corporation that has its principal place of business in Phoenix, Arizona, where it operates a specialty pharmacy.

35.    Each of the pharmacies referenced above holds an Arkansas retail pharmacy permit and provides specialty mail-order pharmacy services or home-delivery pharmacy services that deliver to residents of the State of Arkansas.

11

36. Defendants are members of the Arkansas State Board of Pharmacy (the "Board"), who are charged with enforcing Act 624. Defendant Rodney Richmond is the President of the Board. Defendant Brian Jolly is a member of the Board and its past President. Defendant Debbie Mack is a member of the Board and serves as its Secretary and Vice President. Defendants Lenora Newsome, Clint Boone, Lyn Fruchey, Harold H. Simpson, and Beth Ann Davenport are members of the Board. Defendant John Kirtley is the Executive Director of the Board. Each Defendant's principal place of business is 322 South Main Street, Suite 600, Little Rock, Arkansas 72201.

37. All Defendants are sued solely in their official capacities.

## JURISDICTION AND VENUE

38. This action arises under the Supremacy Clause, U.S. Const. art. VI, cl. 2; 42 U.S.C. § 1983; the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132 *et seq.*; the Medicare Modernization Act, 42 U.S.C. § 1395w-26, and regulations promulgated thereunder, 42 C.F.R. §§ 44, 120, 516 & 2264; *Ex Parte Young*, 209 U.S. 123 (1908); the Court's inherent equitable powers; and the Declaratory Judgment Act, 28 U.S.C. § 2201. Accordingly, this Court has federal-question subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

39. Venue in this District is proper because all Defendants are sued in their official capacities and execute their official duties in the Eastern District of Arkansas, so they therefore are deemed to reside in the Eastern District of Arkansas. *See* 28 U.S.C. § 1391(b)(1). In addition, on information and belief, Defendants Richmond, Jolly, Boone, Fruchey, and Simpson each reside in the Eastern District of Arkansas and all Defendants are residents of the State of Arkansas.

40. Venue additionally is proper in this District because a substantial part of the events giving rise to this suit, including the enactment of Act 624, occurred in this District. *See* 28 U.S.C. § 1391(b)(2).

12

## FACTUAL BACKGROUND

### I.   PBMs Provide Important Benefits To Patients And Plan Sponsors

41.    PBMs are a vital part of the administration and dispensing of prescription drugs. PBMs manage prescription-drug benefits for clients like health insurers, unions, Medicare Part D plans, and government and private employers.  PBMs offer many services, including negotiating with drug manufacturers to secure volume discounts, negotiating with pharmacies to control costs, and processing pharmacy claims.  To those ends, PBMs build and maintain networks of pharmacies that plan sponsors rely on to ensure their members have access to a wide range of needed medications.  Many PBMs also are affiliated with organizations that own pharmacies, including specialty and home-delivery pharmacies, to enhance patient access, convenience, and affordability.  Specialty pharmacies are dedicated to providing drugs that may require special preparation and handling, be unusually expensive or difficult to procure, or treat rare and "orphaned" diseases.  These drugs are often not otherwise available at local independent pharmacies.  Specialty pharmacists receive advanced training about how to serve patients with such diseases.

42.    Home-delivery pharmacies provide home delivery of needed pharmaceuticals to patients, providing a safe and convenient method to acquire prescription drugs.  These mail-order pharmacies are especially crucial for patients who live in rural areas without access to retail pharmacies and for elderly and sick patients who cannot drive to a pharmacy.

43.    Through these measures, PBMs substantially reduce costs and improve patients' access to needed drugs.  Multiple studies have confirmed these benefits.  A 2022 study published by the National Bureau of Economic Research, for example, found that "PBMs are a procompetitive force in healthcare markets."  Casey B. Mulligan, *The Value of Pharmacy Benefit Management* at 8, Nat'l Bureau of Econ. Rsch. (July 2022), https://tinyurl.com/2p9r57kr.  PBMs

13

"increase competition" through "group purchasing and negotiated discounts," much like "Costco, Sam's Club, and other buyers' clubs obtain manufacturer discounts on behalf of their members." *Id.* And because "PBMs obtain significant savings for their clients," the view that they are merely "supply-chain toll collectors performing no legitimate economic function" is a fallacy. *Id.* at 30-31.

44.     A recent article in the *Journal of Managed Care & Specialty Pharmacy* comes to the same conclusions. *See* Susan A. Cantrell, *It Is Time For A More Nuanced Discussion About Pharmacy Benefits Managers*, 30 J. of Managed Care & Specialty Pharm. 1345, 1346 (Dec. 2024), https://tinyurl.com/yyhfeapx. As it explained, "PBMs do not set list prices for pharmaceuticals," which instead is "the purview of pharmaceutical manufacturers." *Id.* PBMs instead "work to lower the price health plans pay for prescription drugs by negotiating rebates with drug manufacturers"—deals they achieve through their "collective purchasing power." *Id.* PBMs therefore are not simply "'middlem[e]n'" who take a cut of profit, and eliminating them would have the "adverse effect" of destroying their ability to "negotiat[e] the largest possible discounts on drug prices." *Id.*

45.     Mail-order pharmacies are an important aspect of the cost savings PBMs provide. As an article from economist Patricia Danzon describes, PBMs' mail-order operations permit them to "capture … discounts." Patricia M. Danzon, *Pharmacy Benefit Management:  Are Reporting Requirements Pro- or Anticompetitive?*, 22 Int'l J. of Econ. of Bus. 245, 250 (2015). PBMs "typically share with plan sponsors the savings realized on mail dispensing" and likewise "offer patients lower cost-sharing on drugs dispensed through the mail." *Id.* at 254, 247. Thus, while mail dispensing "[u]nsurprisingly … has been strongly opposed by retail pharmacies," evidence

refutes "the allegation that PBMs' ownership of mail-order pharmac[ies] harms their customers," and in fact shows "that employers pay lower prices on mail order" prescriptions. *Id.* at 250, 255.

46.    Seeking to harness these pro-competitive benefits, Optum Rx has operated as a PBM for more than a decade.  Optum Rx offers a variety of services, including fulfillment of prescriptions through affiliated mail-order pharmacies, retail pharmacy network administration, and pharmacist consultations.  Optum Rx's main affiliated mail-order pharmacy service, Optum Home Delivery, offers fast shipping and 24/7 access to pharmacists.  Through these mechanisms, Optum Rx provides a full spectrum of pharmacy services to 65 million people in the United States. In 2023, Optum Rx managed $159 billion in pharmaceutical spending, including $63 billion in specialty pharmaceutical spending.

47.    Optum Rx likewise extensively serves Arkansas residents.  As a PBM, Optum Rx currently serves nearly 440,000 patients and beneficiaries throughout the state, including 38,000 who receive prescriptions from Optum pharmacies.  In 2025, Optum-affiliated pharmacies are projected to dispense more than 950,000 prescriptions to Arkansans.  Of those prescriptions, more than 637,000 are fulfilled by Optum's home-delivery and specialty mail-order pharmacies and are shipped into Arkansas from out of state.  And more than 317,000 are dispensed by Optum's eleven brick-and-mortar Genoa pharmacies, located throughout Arkansas.  Plaintiffs further describe several of their specific services below.

48.    *Optum Home Delivery.*  Optum Rx primarily provides mail-order pharmacy services through Optum Home Delivery.  Optum Home Delivery delivers medications directly to patients' doors, which makes the process of filling prescriptions significantly more convenient for patients and, as a result, substantially enhances medication adherence—by some measures, up to 38% higher than when a patient must travel to a local pharmacy to fill prescriptions.  These higher

adherence rates are associated with improved clinical outcomes, reduced mortality, and significant savings for patients.

49.     Mail-order pharmacy services are critical in Arkansas, where about 8% of residents live in "pharmacy deserts" that lack ready access to brick-and-mortar pharmacies.

50.     Optum Home Delivery also uses extensive safety and quality-control measures to ensure accurate and prompt delivery of prescriptions.  Each order undergoes at least 10 distinct safety checks that result in nearly 100% dispensing accuracy—compared to an error rate of up to 1.5% with local independents.  Optum Home Delivery's high dispensing capacity also ensures that orders are promptly fulfilled:  Most orders are shipped within 2 days.  And Optum Home Delivery also offers a hotline where pharmacists are available 24/7 to answer patients' questions—typically within 20 seconds and, if necessary, in different languages.  Optum Home Delivery is projected to dispense more than 550,000 prescriptions in Arkansas throughout 2025.

51.     *Optum divvyDOSE*.    Optum divvyDOSE operates multi-dose mail-order pharmacies in Illinois and Iowa and is designed to assist patients taking six or more medications. Medication adherence for these customers is particularly complex, given the time and expense associated with filling a large number of prescriptions at local pharmacies.  In response, divvyDOSE packages all medications into a single, convenient package so that patients can better manage their medications.  divvyDOSE also offers an auto-refill option so that patients do not have to remember to go into a physical pharmacy or worry that their medications will not be available.  divvyDOSE will deliver approximately 49,000 prescriptions to Arkansans in 2025.

52.     *Optum Specialty Pharmacy*.  Optum Specialty Pharmacy is a mail-order service that helps fill prescriptions for "high touch" drugs, which require significant patient management, education, and monitoring; often require specialized handling; typically treat rare and chronic

16

conditions (such as hemophilia, certain cancers, inflammatory diseases, and neurological conditions); and can be extraordinarily expensive, ranging from $10,000 to over $1 million annually. Optum Specialty Pharmacy has access to more than 200 limited-distribution drugs, including drugs that are so rarely used that they are infrequently stocked—and sometimes never available—at local independent pharmacies. Because such drugs can be particularly expensive to patients and plan sponsors, Optum Specialty Pharmacy proactively converts patient prescriptions to lower-cost generics, resulting in an average savings to health plans and patients of 54%. Moreover, Optum has significantly reduced costs to patients through its technological and managerial expertise—in the case of cancer drugs, for example, by 88%. Optum's specialty pharmacists and care-management team members are specially trained to serve patients with complex and rare diseases, and patients can access pharmacists 24/7 to learn how to manage side effects and properly take medications. Optum Specialty Pharmacy also offers digital services such as patient portals, virtual visits, and condition-specific videos. Optum Specialty Pharmacy is expected to deliver more than 27,000 prescriptions in Arkansas throughout 2025. Patients receiving these distributions have no immediate alternative to access their medications, as independent pharmacies in their areas frequently do not stock such rare, expensive medications.

53. *Optum Frontier Therapies.* Optum provides access to even rarer drugs—so-called "ultra-limited drugs"—through Optum Frontier Therapy, which operates specialty mail-order pharmacies based in Michigan and Nevada. Optum Frontier Therapies is dedicated to serving patients with rare diseases. Because these diseases affect very few people, local independent pharmacies are often unequipped to supply needed medications and lack the capabilities to handle them, such as with ultra-cold chain cell and gene therapies. Moreover, local independent pharmacies often lack the clinical and technical expertise to support dosing, assist with

17

affordability, navigate complex insurance requirements, manage side effects, and otherwise help customers—often pediatric patients and their caregivers—navigate their treatment. By contrast, Optum Frontier Therapies provides a convenient, mail-order delivery option and 24/7 support to pharmacists specially trained in supporting complex therapies and addressing rare diseases. Optum Frontier Therapies will dispense approximately 264 prescriptions throughout Arkansas in 2025.

54. *Optum Infusion Pharmacy*. Optum Infusion Pharmacy similarly facilitates convenient infusion care at home or in ambulatory infusion suites for patients whose diseases (including Crohn's disease, rheumatoid arthritis, bleeding disorders, or multiple sclerosis) require such treatment. To help provide these services, Optum Infusion Pharmacy operates multiple mail-order pharmacies serving patients in Arkansas. Optum Infusion Pharmacy will dispense approximately 1,492 prescriptions to Arkansans in 2025.

55. *Genoa Healthcare*. Through its wholly owned subsidiary, Genoa, Optum owns and operates eleven brick-and-mortar pharmacies throughout Arkansas, employing 56 Arkansans. Optum's Genoa pharmacies fill critical gaps left by Arkansas's independent brick-and-mortar pharmacies. Genoa pharmacies, which are projected to dispense more than 317,000 prescriptions to Arkansans in 2025, are not typical retail pharmacies. Instead, they specialize in serving patients with severe mental illnesses, such as bipolar disorder, schizophrenia, and major depressive disorder. Genoa pharmacies are located in behavioral health clinics across the state to improve medication adherence and health outcomes. Genoa currently provides care to more than 38,000 patients on an annual basis. Most of these patients—approximately 77%—are covered by Medicare or Medicaid.

18

56.    Serving this population presents challenges that Genoa pharmacies are uniquely situated to mitigate. For example, Genoa pharmacists are extensively trained in handling mental-health issues and helping to ensure medication adherence. Medication adherence for Genoa patients exceeds that of patients at local independent pharmacies for several reasons. Genoa's proprietary packaging is designed to make adherence as simple as possible. And dedicated Genoa staff work closely with patients—who typically take 5 or more prescriptions—to ensure that their individual combination of drugs is effective. This population also requires access to drugs that frequently are unavailable at local pharmacies. For example, Genoa patients often require long-acting injectables that local independent pharmacies do not stock because of cost concerns. Act 624 therefore could eliminate access to pharmacy care for some of the most vulnerable populations in Arkansas.

## II.    PBMs And PBM-Affiliated Pharmacies Play A Critical Role In Plan Administration Under ERISA

57.    PBMs like Optum Rx also play a critical role in administering employee-benefit plans governed by ERISA. Congress enacted ERISA in 1974 after "almost a decade of studying the Nation's private pension plans." *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 361 (1980). ERISA was designed "to ensure that plans and plan sponsors would be subject to a uniform body of benefits law," *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 86 (2020) (quotation marks omitted), and to "alleviate" burdens on employers that "discourage the maintenance and growth of ... pension plans." 29 U.S.C. § 1001a(c)(2). "Nothing in ERISA requires employers to establish employee benefit plans." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). Instead, a central feature of the statute is that it leaves employers with wide discretion to decide which benefits they will offer their employees. Rather than mandate particular benefits, ERISA is designed to set uniform national standards for plan administration—and thus to ensure

that employers operating in multiple states can implement their plans nationwide without "interference from laws of the several States." *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 326 (2016).

58. Benefit plans governed by ERISA include employer- and pension-sponsored health plans. *See* 29 U.S.C. § 1002(3). These plans typically include coverage for a range of healthcare services, including pharmaceutical care.

59. To administer pharmaceutical benefits, plans and their administrators often partner with PBMs. PBMs like Optum Rx manage prescription-drug benefits for health plans and negotiate discounts from drug manufacturers and pharmacies for the benefit of their plan-sponsor clients and plan participants. PBM services to plans also include claims administration, data management, and making disbursements. In addition, PBMs design networks of pharmacies that fill prescriptions for health-plan participants. PBMs negotiate discounts with pharmacies that wish to be in PBMs' networks. These negotiations, and PBMs' broader network design, encourage pharmacies to stock cheaper versions of drugs and offer competitive pricing to plan sponsors, resulting in patient savings.

60. Ensuring timely and effective distribution of pharmaceutical benefits to beneficiaries and processing associated claims are key aspects of plan administration, as to which national uniformity is critical. If plan sponsors are forbidden from acquiring drugs from certain PBM-affiliated pharmacies, the process of finding replacement pharmacies increases the complexity and expense of providing benefits and processing claims. Thus, requiring plans to tailor pharmaceutical benefits to individual states impedes efficient and effective plan administration.

61. Optum Rx provides PBM services to thousands of health plans throughout the

20

United States, including those subject to ERISA. In Arkansas specifically, Optum Rx provides those services to scores of ERISA-governed plans. Those ERISA plans rely heavily on Optum Rx's pharmacy network and Optum Rx's affiliated mail-order pharmacies to ensure timely delivery of safe and cost-effective prescription drugs. By leveraging its collective bargaining power with other manufacturers and pharmacies, the economies of scale that result from Optum Rx's affiliated mail-order pharmacies, and its other PBM services, Optum Rx has helped to reduce costs for plans, maximize the efficiency of their administration, and create savings for Arkansans.

### III. PBMs And Affiliated Pharmacies Play A Vital Role In Securing Access To Cost-Effective Drugs Under The Medicare Part D And Medicare Advantage Prescription Drug Programs

62. PBMs also play "a little-known but important part" in securing access to affordable prescription drugs for millions of Medicare beneficiaries. *Rutledge*, 592 U.S. at 83. Medicare is a federal program initiated in 1965 that provides health insurance for people aged 65 or older, as well as for other specified groups. Medicare originally was administered by the federal government alone. In 1997, however, Congress established Medicare Advantage (also known as Medicare Part C) to enhance competition among companies to offer the most attractive health plans to Medicare beneficiaries. Medicare Advantage thus created a private insurance option, in addition to traditional Medicare, in which beneficiaries may opt to receive coverage through private insurers.

63. Six years later, Congress augmented Medicare through the Medicare Modernization Act of 2003. That legislation expanded the prescription-drug benefits available to Medicare beneficiaries through Medicare Part D—an optional prescription-drug program providing benefits to both traditional Medicare and Medicare Advantage beneficiaries. In so doing, Congress established "a comprehensive statutory and regulatory scheme for prescription

21

drugs, which aims to balance cost with access to those drugs." *PCMA v. Rutledge*, 891 F.3d 1109, 1113 (8th Cir. 2018), *rev'd on other grounds*, 592 U.S. 80 (2020).

64. PBMs play an essential role in helping to administer prescription-drug benefits under both Medicare Advantage and Medicare Part D. Plan sponsors contract with PBMs, which then do the "heavy lifting"—leveraging their buying power to negotiate lower prices from pharmacies, and then bundling those pharmacies into pharmacy networks. *PCMA v. Mulready*, 78 F.4th 1183, 1189 (10th Cir. 2023), *pet. for certiorari pending*, No. 23-1213 (U.S. May 15, 2024). Equipped with those networks, PBMs then assist plan sponsors with crafting prescription-drug plans attractive to Medicare beneficiaries. "Because of the economic efficiencies and administrative savvy that PBMs afford, most [Medicare] plans choose to work with PBMs to manage their prescription-drug benefits." *Id.* at 1188. Indeed, PBMs are so closely intertwined with plan sponsors that a regulation of a PBM "functions as a regulation of a [plan sponsor] itself." *Wehbi*, 18 F.4th at 966 (cleaned up).

65. Optum Rx follows this longstanding model by providing services to thousands of Medicare Part D and Medicare Advantage Prescription Drug plan sponsors in the United States, including scores in Arkansas. Optum Rx's services, including home delivery, help to substantially increase medication adherence for Medicare beneficiaries—a particularly important and challenging goal given that many such beneficiaries are of advanced age. Those high adherence rates positively affect plans by enhancing their Medicare Star ratings (a metric that federal agencies use to evaluate Medicare plan quality, and that can create positive financial incentives for plans). And Optum's Genoa specialty pharmacies—77% of whose patients are Medicare beneficiaries—help to ensure that vulnerable Arkansans with serious mental-health difficulties timely receive appropriate and effective medications.

### IV.    The General Assembly Enacts Act 624 To Force PBMs To Divest From Pharmacies

66.    The Arkansas General Assembly began exploring measures to break away from this established PBM model earlier this year.  On January 16, 2025, Representative Jeremiah Moore introduced in the Arkansas House the original version of Act 624 (then called H.B. 1150)—a bill designed to institute a novel, first-in-the nation restriction on PBM affiliation with pharmacies.  The same day, he retweeted a statement that by pursuing "PBM reform," Arkansas could end the "Threat" to "Arkansas Businesses."  @JeremiahMooreAR (Jan. 16, 2025 11:55 AM), https://tinyurl.com/2tp8w773.

67.    Broader legislative consideration of H.B. 1150 began soon after.  The bill's supporters consistently echoed Representative Moore's sentiment that H.B. 1150 would yield widespread benefits for local, independent pharmacies by eliminating competition from out-of-state PBMs.  For example, Representative Moore invited the CEO of the Arkansas Pharmacists Association, John Vinson, to testify about the law's benefits.  Vinson opined that H.B. 1150 would curb "unfair competition" from "out-of-state mail-order pharmacies," which would help "grow the economy locally."  Witnesses and legislators parroted that protectionist motivation throughout subsequent debates.  *See infra* ¶¶ 120-127.  Following a series of amendments, H.B. 1150 passed the House on April 3, 2025.

68.    Similar discussions unfolded in the Senate.  Senator Kim Hammer introduced the bill by claiming that "PBMs are steering patients to out-of-state mail order pharmacies that they own or [are] affiliated with."  H.B. 1150 is thus designed, he explained, to shift patients back to "their local community pharmacy."  Vinson and several local pharmacists likewise touted the bill's benefits for the local economy.  H.B. 1150 passed the full Senate on April 9, 2025.

69.    Governor Sanders then signed H.B. 1150 into law as Act 624 on April 16, 2025—making Arkansas the first-ever State to ban PBM ownership of pharmacies.  *See, e.g.*, Ed

23

Silverman, *Arkansas adopts first-in-the-nation law forcing companies to choose between running a PBM or pharmacies*, StatNews (Apr. 16, 2025), https://tinyurl.com/a4w5yh3j. The Governor's accompanying press release claimed that "massive corporations" have been "attacking our state," and thus that Arkansas would "be the first [state] in the country to hold them accountable." *Sanders Signs Legislation to Ban Anti-Competitive PBM Practices*, Arkansas.gov (Apr. 16, 2025), https://tinyurl.com/mwpts25m. The Governor's press release likewise quoted a local pharmacist who described the law as "a win for local businesses." *Id.*

70. As enacted, Act 624 has six key features relevant to this lawsuit.

71. *First*, the law forbids a PBM from acquiring a "direct or indirect interest in, or otherwise hold[ing], directly or indirectly, a permit … for the retail sale of drugs or medicines in this state." Act 624 § 2(b), to be codified at Ark. Code Ann. § 17-92-416(b). In other words, a pharmacy directly or indirectly owned or "otherwise hel[d]" by a PBM cannot maintain a retail pharmacy permit to serve Arkansas patients after the law's effective date, January 1, 2026. *See id.* § 3. The Arkansas State Board of Pharmacy is directed to "either revoke or not renew a permit of an entity that violates this section." *Id.* § 2(c), to be codified at Ark. Code Ann. § 17-92-416(c). The purpose of the provision, as supporters made clear, is to force PBMs to divest from their pharmacies, or else abandon their services to Arkansas patients.

72. *Second*, Act 624 codifies a sweeping definition of the entities that constitute "pharmacy benefits managers." Under existing Arkansas law, PBMs are defined to mean a business or its subsidiaries that "provid[e] claims processing services or other prescription drug or drug services, or both, for health benefit plans." Ark. Code Ann. § 23-92-503(8)(A). But Act 624 expands the definition to include any "entity that … [h]as a direct or indirect ownership interest in a pharmacy benefits manager." Act 624 § 2(a)(B)(2)(A)(B)(ii), to be codified at Ark. Code Ann.

§ 17-92-416(a)(B)(2)(A)(B)(ii). Thus, Optum, Inc. is *itself* treated as a PBM under Act 624 simply because it is the parent company of Optum Rx, and Optum Rx provides PBM services. All mail-order and brick-and-mortar pharmacies that Optum, Inc. owns are therefore deemed PBM-affiliated.

73. *Third*, Act 624 purports to create an exception for pharmacies that distribute "certain rare, orphan, or limited distribution drugs that are otherwise unavailable in the market to a patient or a pharmacy that would otherwise be prohibited under this section." Act 624 § 2(d)(1), to be codified at Ark. Code Ann. § 17-92-416(d)(1). But pharmacies offering such drugs are nonetheless to be stripped of their retail pharmacy permits, and instead can obtain only a temporary "limited use permit" covering only specific rare drugs, on a drug-by-drug basis, for a limited period of just ninety days at a time. *Id.* § 2(d)(2)(A)(ii) ("[T]he board shall convert the retail permit for the prohibited pharmacy to a limited use permit for that pharmacy for a period of no less than ninety (90) days."). And the authority to grant even these temporary limited-use permits expires on September 1, 2027, leaving them entirely unavailable thereafter. *Id.* § 2(d)(2)(B), to be codified at Ark. Code Ann. § 17-92-416(d)(2)(B). Before that authority expires, pharmacies "may request" that their temporary limited-use permit be extended, but Act 624 establishes no criteria for adjudicating those requests and merely delegates responsibility to the Board to make up a "policy" for their consideration. Act 624 § 2(d)(3)(B)(ii), (d)(3)(B), to be codified at Ark. Code Ann. § 17-92-416(d)(3)(B)(ii), (d)(3)(B). As a result, even if pharmacies can obtain such a permit, the Act threatens to embroil them in an uncertain and potentially burdensome license-renewal process every three months while the exception remains in effect, and then to force them out of business after the exception expires in 2027. *Id.* § 2(d)(2)(B), to be codified at Ark. Code Ann. § 17-92-416(d)(2)(B).

74.    *Fourth*, Act 624 creates a temporary exception through which pharmacies offering "same-day patient access for pharmacist services, a prescription for a controlled substance, mental health services, or other critical patient healthcare services" may briefly retain their retail pharmacy permits.  Act 624 § 2(e), to be codified at Ark. Code Ann. § 17-92-416(e).  But such pharmacies may seek the exemption *only* "if there is a pending sale of the pharmacy to an eligible buyer"—in other words, after the divestiture process has already begun.  *Id.*  The exception thus grants only temporary relief until the sale process is completed—and even then, it is available only if the pharmacy succeeds in identifying and reaching terms with a willing, eligible buyer.

75.    *Fifth*, the law contains a significant carve-out for local pharmaceutical interests.  It provides that Act 624 "does not apply to a pharmacy employer and a pharmacy" that "has [a] direct or indirect interest in a pharmacy benefits manager" if "[t]he pharmacy employer is the sole Arkansas client of the pharmacy benefits manager that the pharmacy employer has a direct or indirect interest in," and "exclusively services the employees and dependents of the pharmacy employer while utilizing the affiliated pharmacy benefits manager in this state."  Act 624 § 2(f)(1)-(3), to be codified at Ark. Code Ann. § 17-92-416(f)(1)-(3).  Thus, for example, an *Arkansas* pharmacy remains free to maintain a corporate affiliation with a PBM, so long as its PBM serves solely that pharmacy's employees in Arkansas.

76.    *Sixth*, after receiving written notice from the Board that they are out of compliance with Act 624, affected pharmacies must notify their patients "via mail, email, or through the pharmacy's patient portal" that they "can no longer dispense retail drugs to the patient on or after January 1, 2026."  Act 624 § 2(c)(1)(A)-(B), to be codified at Ark. Code Ann. § 17-92-417(c)(1)(A)-(B).

## V.    Act 624 Threatens Devastating Consequences For Thousands Of Arkansas Patients And The Longstanding Industry Supporting Them

77.    Act 624 will wreak havoc on Optum's operations and the lives of tens of thousands of patients in Arkansas.  The law will effectively force Optum Rx to discontinue its mail-order pharmacy services to Arkansas, and likewise will force Optum to divest from its eleven brick-and-mortar Genoa pharmacies throughout the state.  And Optum must irreparably damage its reputation with its clients and their members by notifying them that they will no longer be able to obtain the services from Optum-affiliated pharmacies they have relied on for years.  Patients, in turn, will be left scrambling to find substitute suppliers for much-needed medications from independent local pharmacies.  At best, patients will carry heavier burdens by having to physically fill prescriptions, particularly when those patients reside in one of Arkansas's numerous pharmacy deserts.  This state of affairs demonstrably lowers medication adherence and leads to worse patient outcomes.  And at worst, such medications simply will be unavailable—which is precisely why PBM-affiliated pharmacies have worked so hard to fill that gap.  Injunctive and declaratory relief are necessary and appropriate to avert these impending harms.

78.    Act 624's restrictions threaten to harm Optum in at least four different ways.

79.    *First*, Act 624 will ban virtually all of Optum's mail-order pharmacy services throughout Arkansas.  For Optum, divesting from its mail-order pharmacies is not a realistic option.  Doing so would cause the chaos that Act 624 threatens to spill beyond Arkansas's borders and to *every* plan and patient nationwide that relies on Optum's affiliated pharmacies to procure cost-effective and safe prescriptions.  As a result, Optum's pharmacies will be "directly or indirectly" owned or "otherwise h[eld]" by a PBM (*i.e.*, by Optum, Inc., a PBM by virtue of owning Optum Rx), and thus will be ineligible for a retail pharmacy permit in Arkansas—rendering their operations in Arkansas practically defunct.  Act 624 § 2(b), to be codified at Ark.

27

Code Ann. § 17-92-416(b).  In turn, Optum pharmacies must notify all of their affected patients in Arkansas that they are being stripped of access to their preferred pharmaceutical services, and that they must find alternatives by January 1.

80.     *Second*, Act 624 will significantly impair the operations of Optum Specialty Pharmacy and Optum Frontier Therapies—notwithstanding Act 624's purported temporary exception for "certain rare, orphan, or limited distribution drugs." Act 624 § 2(d)(1), to be codified at Ark. Code Ann. § 17-92-416(d)(1).  That exception would downgrade the *retail* permits of the Optum pharmacies servicing the Optum Specialty Pharmacy and Optum Frontier programs to a temporary "limited use permit" that must be periodically renewed.  *Id.* § 2(d)(2)(A)(ii), to be codified at Ark. Code Ann. § 17-92-416(d)(2)(A)(ii).  Not all specialty drugs that these pharmacies prescribe, however, fall within the Act's narrow definition of "rare, orphan, or limited distribution drugs."  Thus, these pharmacies will be forced to discontinue their former distributions into Arkansas that fall outside of the new limited-use permit.  And even for drugs that fall within that new limited-use permit, the disruption from Act 624 will still be substantial.  Patients are often prescribed both rare and common drugs in parallel as part of a broader treatment regimen—for instance, a rare drug to combat cancer and a common anti-nausea medication to combat side effects.  But patients no longer will be able to rely on Optum as a one-stop source to conveniently obtain the needed combination of drugs, and instead will be forced to chase down different parts of their medication suite from different pharmacies, with no assurance that those medications will even remain available.

81.     *Third*, Act 624 will force Optum to divest from its eleven brick-and-mortar Genoa pharmacies throughout Arkansas.  Indeed, legislators and supporters of Act 624 made clear during the legislative debates that forcing divestiture of brick-and-mortar pharmacies in particular was a

28

central goal of the legislation. And while Act 624 provides that the Board "may" extend the permits of pharmacies that, like Genoa, "offe[r] same-day patient access" to, *inter alia*, "mental health services," this exception is available only if the pharmacy has *already entered* the divestiture process and succeeded in identifying and reaching terms with a willing, eligible buyer. Act 624 § 2(e), to be codified at Ark. Code Ann. § 17-92-416(e). And even then it is merely a temporary fix until the divestiture is complete. In other words, Optum must incur the time and expense to find qualified buyers for its Genoa stores—or else shutter them altogether—and the Board then "may" briefly extend Genoa's permits to ensure continuity of patient access as a new, "eligible buyer" takes over Genoa's operations from Optum. *Id.*

82. *Fourth*, Act 624 would substantially interfere with Optum Rx's provision of PBM services to its plan clients. As a key part of those services, Optum Rx builds and maintains networks of pharmacies to provide needed prescription drugs to its PBM clients' Arkansas beneficiaries. Those networks regularly rely on PBM-affiliated pharmacies—both affiliates of Optum and those of other PBMs—for their safety, convenience, and cost-effectiveness. Yet Act 624 will require Optum Rx to excise those pharmacies from its networks and reconstruct those networks based on alternative, independent pharmacies. Narrowing the range of available pharmacies in this manner will cause substantial disruption as Optum Rx must redesign its pharmacy networks around, and negotiate new contracts with, a far more limited universe of costlier, less-efficient independent pharmacies.

83. These impacts are not confined to Optum or even to PBMs more broadly. Those most severely affected by its provisions will not be out-of-state corporations, but individual Arkansans whose health has been placed in the middle of a political debate by the local pharmacy lobby. The practical consequences of Act 624 for these real people will be severe. Rather than

enhancing patient choice, Act 624 reduces it by dictating that patients *only* may fill prescriptions at independent pharmacies. Those pharmacies are often less accurate at dispensing drugs than PBM-affiliated pharmacies. While PBM-affiliated pharmacies' dispensing accuracy hovers near 100%, local pharmacies have error rates of up to 1.5%—a major difference given the potentially serious consequences of depriving patients of an essential medication or accidentally dispensing a medication with side effects or harmful interactions with other drugs. Many Arkansans also live in rural areas or pharmacy deserts and thus will have to drive several miles to access their nearest local pharmacies. Many other Arkansans are too elderly or sick to travel to local pharmacies. Still others require specialty medications that local pharmacies do not regularly stock. And all Arkansans forced to use independent pharmacies will lose access to the convenience and cost-savings associated with PBM-affiliated pharmacies. As Senator Fredrick Love explained when voting against Act 624, what the law *actually* does—aside from conferring a windfall on local industry—is "disenfranchis[e] people that really need their medicine."

### GROUNDS FOR RELIEF

84. Act 624 violates the U.S. Constitution and federal law in four distinct ways. *First*, Act 624 is preempted under ERISA. ERISA's broad preemption clause invalidates state laws that, like Act 624, unduly interfere with plan administration through onerous, state-specific requirements. *Second*, Act 624 is likewise preempted by the Medicare Modernization Act and associated regulations. Act 624 is in direct conflict with the standards and requirements laid down in those regulations—including that mail-order pharmacies may be used to deliver prescription-drug benefits. *Third*, Act 624 runs afoul of the dormant Commerce Clause, which invalidates state laws that, as here, discriminate against interstate commerce or unduly burden interstate commerce in relation to their (vanishing) local benefits. And *fourth*, Act 624 effects an uncompensated taking of Optum's eleven brick-and-mortar Genoa pharmacies throughout Arkansas. Prospective relief

30

is necessary and appropriate to vindicate these foundational statutory and constitutional requirements.

## I.    ERISA Preempts Act 624

85.    Federal law supplies numerous bases to avert these impending harms to Optum Rx. The first is ERISA, which preempts state laws that improperly regulate employee-benefit plans—in contravention of ERISA's directive that such regulation is exclusively a matter of federal concern. It is "beyond dispute" that federal courts may "enjoin state officials" from enforcing state laws that are "pre-empted by a federal statute." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983).

### A.    ERISA Broadly Preempts State Interference With The Administration Of Employee-Benefit Plans

86.    To ensure national uniformity in plan administration, ERISA's preemption clause expressly preempts "any and all State laws insofar as they may now of hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). That clause has "a broad scope," *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739 (1985), and "deliberately expansive" sweep, *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 46 (1987). "Congress's intent" in framing the provision was "to establish the regulation of employee welfare benefit plans 'as exclusively a federal concern'" by eliminating "a multiplicity of regulation" concerning benefit plans. *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995).

87.    As the Eighth Circuit has explained, "[a] State law '"relates to"' an ERISA plan and is preempted if it has 'a *connection with* or a reference to such a plan.'" *Pharm. Care Mgmt. Ass'n v. Gerhart*, 852 F.3d 722, 728 (8th Cir. 2017) (emphasis added). This case involves the first prong of this test—an improper "connection with" ERISA plans. A state law can have an impermissible "connection" with an ERISA plan in at least two ways: when "(1) it 'governs … a

31

central matter of plan administration,'" or "(2) it 'interferes with nationally uniform plan administration.'" *Wehbi*, 18 F.4th at 968.

88.    *National Uniformity.*    State laws interfere with "nationally uniform plan administration" when, among other things, they impose "processes unique to that State," *Gerhart*, 852 F.3d at 730, or "require the tailoring of plans and employer conduct to the peculiarities of each jurisdiction," *Travelers*, 514 U.S. at 656-57 (citation omitted).    As the Supreme Court has recognized, "[u]niformity is impossible ... if plans are subject to different legal obligations in different States." *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 148 (2001).

89.    *Central Matters of Plan Administration.*    A law affects "a central matter of plan administration" when, among other things, it "forc[es] plans to adopt any particular scheme of substantive coverage," *Rutledge*, 592 U.S. at 88.    That includes laws regulating the distribution of, and compensation for, pharmaceuticals.    *See Gerhart*, 852 F.3d at 731 (Iowa law "impose[d] mandates and restrictions on a PBM's relationship with Iowa and its pharmacies that run counter to ERISA's intent of making plan oversight and procedures uniform").

90.    Moreover, state laws run afoul of ERISA even if they interfere with plan administration or national uniformity "indirectly." *Id.* at 728.    It is thus of no moment that Act 624 purports to regulate PBMs rather than ERISA plans as such.    "Because PBMs manage benefits on behalf of plans, a regulation of PBMs 'function[s] as a regulation of an ERISA plan itself.'" *Wehbi*, 18 F.4th at 966.

**B.    Act 624 Is Preempted Because It Severely Disrupts Nationwide Uniformity In Plan Administration**

91.    Act 624 will force plans serving Arkansas beneficiaries to procure prescription drugs from independent pharmacies, rather than PBM-owned pharmacies (including mail-order pharmacies) on which such plans traditionally have heavily relied.    In so doing, Act 624 threatens

32

to wreak havoc on plan uniformity and will create significant problems for plan administration. PBMs, including Optum Rx, typically negotiate with pharmacies and manufacturers on a nationwide basis and sign corresponding contracts providing for nationwide coverage of beneficiaries. Because those contracts provide for nationwide coverage, Optum Rx can accurately predict drug prices and establish price guarantees for plans. And because plans and beneficiaries expect to receive mail-order pharmacy services, such nationwide contracts invariably include PBM-affiliated mail-order pharmacies.

92.     Act 624 will now make it impossible to maintain such contracts on a nationwide basis. PBMs instead will now have to establish a two-track process: For the rest of the United States, they can conclude contracts covering beneficiaries in 49 states, can offer mail-order pharmacy services from PBM-affiliated pharmacies, can anticipate prices with respect to that set of drugs and beneficiaries, and can establish corresponding price guarantees. *See, e.g.*, *Pharm. Care Mgmt. Ass'n v. Rowe*, No. Civ. 03-153-B-H, 2005 WL 757608, at *1 (D. Me. Feb. 2, 2005) (PBMs "permit the benefits provider customers to obtain drugs at established prices."). In Arkansas, however, PBMs will have to negotiate special, good-for-Arkansas-only contracts with different counterparties, *i.e.*, independent pharmacies. And the prices for drugs offered with respect to those Arkansas-specific plans will necessarily differ from prices established for the rest of the United States, as PBMs will have to account for the newfound lack of competition in Arkansas (and thus higher Arkansas drug prices). That special, Arkansas-specific negotiation process will result in continuous administrative headaches for plan administrators, as they must constantly work to ensure that local, independent pharmacies are able to fill beneficiaries' prescriptions. It will also result in acute disuniformity in plan benefits. The same plan benefits

33

that are offered and expected in the rest of the country would be legally forbidden within Arkansas's borders.

93.    The chaos Act 624 threatens will not be confined to Arkansas residents. Rather, the law applies to *anyone* who attempts to acquire prescription drugs in Arkansas—which will cause even more disruption for plans with beneficiaries nationwide. For example, consider an out-of-state visitor to Arkansas enjoying a stay with family, or making a trip for business, who forgets a prescription or needs a prescription refilled during her stay. In her home state, her benefits plan could quickly supply needed medications through a PBM-affiliated pharmacy. In Arkansas alone, however, filling a prescription in such a manner would be illegal. Her plan thus would have to make special arrangements to ensure that medications are delivered from an independent pharmacy. ERISA was enacted precisely to prevent such parochial requirements from impeding efficiency and nationwide uniformity.

C.    **Act 624 Is Preempted Because It Impermissibly Regulates An Issue Central To Plan Administration**

94.    Act 624 likewise contravenes ERISA's directive that states may not impede central matters of plan administration. Prescription-drug benefits are an integral component of virtually all employee-benefit plans. And how plans choose to structure their pharmacy networks is one of the most central tasks in providing pharmacy benefits. *See Mulready*, 78 F.4th at 1198. The composition of a pharmacy network is integral to determining which benefits a beneficiary is eligible for, how a beneficiary accesses those benefits, and the extent of the beneficiary's cost-sharing obligation.

95.    Plans thus strive to find partners that can reliably deliver timely, safe, and cost-effective pharmaceutical benefits. Unsurprisingly, PBM-affiliated mail-order pharmacies have become important in many plan-benefit structures for numerous reasons. Mail-order pharmacies

reduce costs and create savings, which plan administrators can then pass on to plan participants. Having mail-order pharmacies in plans' networks also increases cost certainty and predictability. Plans can accurately project prescription-drug costs based on large national mail-order pharmacies' reliable operations. By contrast, having to negotiate ad hoc contracts with independent pharmacies decreases cost certainty, which leads rational plan administrators to be more conservative with the services designated as covered, or to require higher cost-sharing from plan participants (leading to less benefits overall). The ability to contract with large national mail-order pharmacies also enhances administrative efficiency relative to having to negotiate claims processing individually with a series of independent local pharmacies. And large national mail-order pharmacies enhance quality control. These pharmacies are a known quantity, so plans can ensure that they are receiving high-quality services. By contrast, plans would encounter significant new administrative burdens from having to vet independent local pharmacies to ensure that those pharmacies can meet a plan's quality standards.

96. Act 624 would upend these established pharmacy networks and their associated benefits, thereby interfering with key decisions by plan administrators. By forbidding plans from distributing pharmaceutical benefits through PBM-affiliated pharmacies rather than independent pharmacies, Act 624 in effect "prohibits employers from structuring their employee benefit plans in a [certain] manner." *Shaw*, 463 U.S. at 97. Yet it is well established that states may not force provider networks to contract with "any willing provider," *Ky. Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 332-34 (2003), deny plans "the right to structure their benefits in a particular manner," *CIGNA Healthplan of La., Inc. v. Louisiana*, 82 F.3d 642, 648 (5th Cir. 1996), or "mandat[e] benefit structures," *Ky. Ass'n of Health Plans, Inc. v. Nichols*, 227 F.3d 352, 362-63

(6th Cir. 2000). Act 624 thus interferes with "'a central matter of plan administration'" and has "an impermissible connection with ERISA plans." *Mulready*, 78 F.4th at 1198.

## II.    Medicare Statutes And Regulations Preempt Act 624

97.    In addition to ERISA preemption, Act 624 should also be enjoined because it is preempted by the Medicare Modernization Act. That Act creates a comprehensive statutory and regulatory framework to promote market competition, within limits set by Congress and the Centers for Medicare and Medicaid Services ("CMS"). To protect this market-based scheme from state interference, Congress included a sweeping preemption provision, providing that Medicare statutory provisions and regulations preempt any state law or regulation operating "with respect to" Medicare Part D and MAPD plans. As explained below, Act 624 operates "with respect to" these plans.

### A.    Medicare Standards Preempt Any State Law Or Regulation "With Respect To" Medicare Part D And Medicare Advantage Prescription Drug Plans

98.    The Medicare Modernization Act provides that statutory provisions and regulations "established under" Medicare Part D or the Medicare Advantage Prescription Drug program (MAPD) "shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to [Medicare Part D or MAPD] plans which are offered by" plan sponsors. 42 U.S.C. § 1395w-26(b)(3); *see also id.* § 1395w-112(g).

99.    Under Eighth Circuit precedent, this express preemption provision means that the "federal scheme preempts a state law when (1) Congress or the Centers for Medicare and Medicaid Services (CMS) has established 'standards' in the area regulated by the state law; and (2) the state law acts 'with respect to' those standards.'" *Rutledge*, 891 F.3d at 1113. Put differently, state laws are preempted as applied to Medicare Part D and MAPD plans if those laws "regulate the

same subject matter" as a "statutory provision or regulation" under Medicare Part D or MAPD. *Wehbi*, 18 F.4th at 971-72.

100. The Eighth Circuit has recognized that express Medicare preemption "preempts a broad swath of state laws," *Wehbi*, 18 F.4th at 971 (quotation marks omitted), and has previously held that state laws touching upon subject matters addressed by Medicare statutes and regulations, like price regulation and pharmacy access, were "obviously" and "easily" preempted, *Rutledge*, 891 F.3d at 1113-14. The Eighth Circuit has characterized this breadth as akin to "field preemption" and has stressed that "conflict between the state law and the federal standard is unnecessary." *Wehbi*, 18 F.4th at 970-71 (quotation marks and brackets omitted); *see also id.* at 971 (explaining that Congress amended the provision in 2003 to remove the requirement that state laws be "inconsistent with such standards" (quotation marks omitted)).

101. Other circuits agree about the breadth of express Medicare preemption. The First Circuit has explained that the preemption clause's "plain language sweeps broadly" and expands "the scope of preemption beyond those laws that directly conflict with federal standards." *Medicaid & Medicare Advantage Prods. Ass'n of P.R., Inc. v. Emanuelli Hernandez*, 58 F.4th 5, 12 (1st Cir. 2023). The Tenth Circuit has similarly held that the "sweeping Part D preemption clause is akin to field preemption." *Mulready*, 78 F.4th at 1206 (quotation marks omitted).

102. In addition to express Medicare preemption, the Eighth Circuit has also recognized *implied* Medicare preemption. A state law or regulation is *impliedly* preempted by Medicare if it "could frustrate the purpose of" a federal Medicare Part D or MAPD standard. *Wehbi*, 18 F.4th at 972.

103.    In sum, state laws and regulations are preempted by Medicare if they "conflict with, regulate the same subject matter as, or otherwise frustrate the purpose of any federal Medicare Part D [or MAPD] standard." *Wehbi*, 18 F.4th at 974.

**B.      Act 624 Is Preempted Because It Regulates "With Respect To" Medicare Part D And Medicare Advantage Prescription Drug Plans**

104.    Act 624 conflicts with, encroaches upon, and otherwise frustrates the purpose of the numerous federal standards governing Medicare Part D and MAPD plans.  These standards are a key component of CMS's "network adequacy standards," which are designed to ensure appropriate access to prescription drugs for enrollees, and which have specific requirements about the maximum times and distances involved in delivering those benefits.  For instance:

105.    *Mail-Order Pharmacies*.  Plan sponsors are expressly authorized to supplement their pharmacy network with "non-retail pharmacies, including pharmacies offering home delivery via mail-order and institutional pharmacies."  42 C.F.R. § 423.120(a)(3).  Act 624 effectively announces that plan sponsors *cannot* supplement their networks with "pharmacies offering home delivery via mail-order" when such pharmacies are PBM-affiliated.  Because most mail-order pharmacies are so affiliated, Act 624 bans virtually all mail-order pharmacies from Arkansas.  The law thus conflicts with and, at minimum, encroaches upon this authorization.  Moreover, Act 624 frustrates the purpose of this provision, namely, to ensure that plan sponsors have the flexibility to ensure that beneficiaries can access "pharmacies offering home delivery via mail-order."

106.    *Plan-Affiliated Pharmacies*.  The federal standards expressly contemplate that "pharmacies [may be] owned and operated by the MA[PD] organization or [Part D] cost contract." 42 C.F.R. § 423.120(a)(7)(i).  Indeed, those standards relax the pharmacy-access requirements for plan-affiliated pharmacies to *safeguard* the use of those pharmacies by plan sponsors.  *See id.*  Act 624 does not advance that goal.  Quite the opposite.  By banning PBM-affiliated pharmacies, Act

624 addresses—and proscribes—an ownership structure expressly contemplated by the federal standards. And it effectively repeals the "[w]aiver of pharmacy access requirements" that those standards grant to "pharmacies owned and operated by the MA[PD] [or Part D] organization." 42 C.F.R. § 423.120(a)(7)(i). Act 624 would be preempted if it addressed, much less eliminated, the "[w]aiver" offered to MAPD and Part D organizations; it cannot escape preemption by eliminating the "MA[PD] [or Part D] organization" instead.

107. *Any Willing Pharmacy*. The federal standards require that plan sponsors "contract with any pharmacy that meets the [plan] sponsor's standard terms and conditions." 42 C.F.R. § 423.120(8)(i). Act 624 intervenes to say no: Plan sponsors are *not* required to contract with any pharmacy that meets their standard terms and conditions. Even if a pharmacy meets their standard terms and conditions, plan sponsors *cannot* contract with that pharmacy if it maintains a particular ownership structure disfavored by the State of Arkansas. This encroachment upon and contradiction of the federal standard is impermissible. It also frustrates the purposes of the standard, one of which is to ensure broad coverage of pharmacies, without favoritism (whether from plan sponsors or the State of Arkansas).

108. *New, Significant Regulatory Requirements*. The federal standards contemplate that, apart from Congress, CMS is the entity that will "impose new, significant regulatory requirements on a PDP sponsor or a prescription drug plan." 42 C.F.R. § 423.516; *see also* 42 U.S.C. § 1395w-26(b)(4). And the standards regulate the implementation timeline for major regulations, providing that "CMS may not implement" major regulations "other than at the beginning of a calendar year." 42 C.F.R. § 423.516; *see also* 42 U.S.C. § 1395w-26(b)(4). Here, Act 624 asserts for itself the power to "impose new, significant regulatory requirements" on plan sponsors. Indeed, it even disregards the timeline set for the implementation of such requirements. Although Act 624's

39

effective date is January 1, 2026, one of its major requirements expires on September 1, 2027—*after* the calendar year begins—to be replaced, at some point, by a different regulatory regime. These requirements govern the process through which Arkansas will "assess the need for rare, orphan, or limited distribution drugs" and decide whether to grant a "limited use permit" to allow beneficiaries to continue to access those drugs through PBM-affiliated pharmacies. Act 624 § 2(d)(2)(A)(i), to be codified at Ark. Code Ann. § 17-92-416(d)(2)(A)(i). Act 624 cannot claim this power for itself and then refuse to abide by the timeline that limits CMS.

109. *Home-Infusion Pharmacies.* The federal standards also expressly require that plan sponsors "provide adequate access to home infusion pharmacies" and "ensure that such network pharmacies" meet stringent requirements governing "clinically appropriate" care, "short-term acute care and long-term chronic care therapies," the "professional services and ancillary supplies necessary for home infusion therapy," and so on. 42 C.F.R. §423.120(a)(4). Act 624 makes no provision for this requirement. PBM-affiliated home-infusion pharmacies, consistent with these requirements, deliver an unparalleled standard of care for Medicare beneficiaries and dominate the home-infusion space. By banning PBM-affiliated pharmacies, Act 624 encroaches upon and conflicts with this federal standard. Act 624 also frustrates its purpose—namely, to ensure beneficiaries' continued access to high-quality home-infusion pharmacies in this particularly sensitive area of care.

110. *Communications.* The federal standards comprehensively regulate the manner and content of plan sponsor communications to Medicare beneficiaries. *See* 42 C.F.R. § 423.2264. The federal standards also make it unlawful for any plan sponsor to "[o]rally or in writing, or by any action or inaction, request or encourage an individual to disenroll" from any prescription-drug plan it offers, subject to limited exceptions. *Id.* § 423.44(a). Yet Act 624 requires PBM-affiliated

pharmacies to "provide written notice" to "each patient and each patient's prescribing healthcare provider that has used the pharmacy within the previous twelve (12) months" that the "pharmacy can no longer dispense retail drugs to the patient." Act 624 § 3(c)(1)(A), to be codified at Ark. Code Ann. § 17-92-417(c)(1)(A). Act 624 also requires the plan sponsor to include within that notice a "list of Arkansas pharmacies that hold an active retail pharmacy permit that are not reasonably expected to violate § 17-92-416 as of January 1, 2026." *Id.* § 2(c)(1)(A), (c)(2), to be codified at Ark. Code Ann. § 17-92-417(c)(1)(A), (c)(2). Arkansas is not only commandeering PBM-affiliated pharmacies' communications but is doing so to direct Medicare beneficiaries *away* from PBM-affiliated pharmacies and *toward* independent pharmacies.

111. Act 624 conflicts with, encroaches upon, and otherwise frustrates these and other federal standards, individually and collectively. As a result of Act 624's new restrictions, plans that previously relied on mail-order pharmacies will have to fundamentally redesign their networks at best, and at worst will not be able to provide beneficiaries access to needed drugs—in which case they must leave their plans to access medications. Beneficiaries then will be left to search for alternatives from independent pharmacies, likely at higher prices. And the law's effects will be particularly acute for certain plans, such as United's Medicare & Retirement Group Retirees plan. Unlike individual Medicare plans that file benefits for every CMS contract they hold, Group Retirees leverages a *single* contract with CMS, and thus must provide *identical* benefits across all markets. While Group Retirees previously relied on Optum Home Delivery to efficiently deliver nationally uniform prescription-drug benefits, it now must rush to find an alternative, non-PBM-affiliated supplier to provide the needed, identical benefits in Arkansas.

112. Federal law does not tolerate such local disruption to Medicare plan design and prescription-drug coverage. Medicare creates a "comprehensive statutory and regulatory scheme

41

for prescription drugs, which aims to balance cost with access to those drugs." *Rutledge*, 891 F.3d at 1113. To expand access and lower costs, Congress cleared the field and created a space for market competition within guardrails established by *federal* law. *Cf. Emanuelli Hernandez*, 58 F.4th at 8; *see also* Medicare Program; Medicare Prescription Drug Benefit, 70 Fed. Reg. 4194, 4244 (2005) ("marketplace competition ensures that enrollees receive low prices for prescription drugs"). And Congress passed a sweeping preemption provision to ensure this marketplace would remain free from state interference, perhaps anticipating protectionist efforts by states dissatisfied with the outcome of competition and interested in a different set of winners and losers. Indeed, when describing the need for broad preemption, Congress could not have been clearer: these Medicare programs are "federal program[s] operated under Federal rules," and "State laws, do not, and should not apply, with the exception of state licensing laws or state laws related to plan solvency." H.R. Rep. No. 108-391, at 557 (2003) (Conf. Rep.); *see also Mulready*, 78 F.4th at 1206.

113. Because Act 624 conflicts with or encroaches upon the federal Medicare Part D and MAPD standards, the Arkansas law could only survive *express* preemption if it fell within the statutory exceptions for "state laws related to plan solvency" and "state licensing laws." Act 624 is not and does not purport to be related to plan solvency. Nor is Act 624 a "state licensing law," as that term is used in the statute. Rather than the traditional state licensing laws envisioned by the statute, Act 624 is a "first in the country" attempt to wield Arkansas's licensing power to impose Arkansas's preferred corporate structure on pharmacies operating within the state. *Sanders Signs Legislation to Ban Anti-Competitive PBM Practices*, *supra*. As one state senator and proponent of the bill explained, Act 624 uses "an area where [Arkansas] has control"—

42

"licensing"—"as a way" to "tell the federal government to support the State of Arkansas" and "get what [Arkansas] want[s] the federal government to do."

114. If states could circumvent Medicare preemption by coupling whatever action they wanted to take with the revocation or refusal of licenses, "the exception would swallow the rule." *United States v. Kirchoff*, 387 F.3d 748, 751 (8th Cir. 2004) (quotation marks omitted); *see also Pac. Gas & Elec. Co. v. FERC*, 113 F.4th 943, 949 (D.C. Cir. 2024) ("We cannot read an exception to swallow the rule." (quotation marks and brackets omitted)). That result "is to be avoided" as a matter of statutory interpretation. *Kirchoff*, 387 F.3d at 51 (quotation marks omitted).

115. Accordingly, Act 624 is *expressly* preempted by Medicare because it conflicts with or encroaches upon the federal standards and does not fall within the two statutory exceptions. And Act 624 is *impliedly* preempted because it otherwise frustrates those standards.

## III. Act 624 Violates The Dormant Commerce Clause

116. Act 624 should also be enjoined because it violates the dormant Commerce Clause. *See Dennis v. Higgins*, 498 U.S. 439, 451 (1991); *accord Pioneer Military Lending, Inc. v. Manning*, 2 F.3d 280, 285 (8th Cir. 1993) ("Commerce Clause plaintiffs have a cause of action under § 1983."). Act 624 violates the dormant Commerce Clause in two distinct ways: (1) The law is undeniably protectionist in its text, purpose, and effects; and (2) it will unduly burden interstate commerce in clear excess of any putative local benefit.

### A. State Laws That Discriminate Against Out-Of-State Competitors Or Unduly Burden Interstate Commerce Are Invalid

117. "[T]he 'very core'" of the dormant Commerce Clause is an "antidiscrimination principle": that the "Commerce Clause prohibits the enforcement of state laws 'driven by … "economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."'" *Nat'l Pork Producers Council v. Ross*, 598

U.S. 356, 369 (2023); *accord Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 517 (2019) (describing "the Commerce Clause as the primary safeguard against state protectionism"). A law thus violates the dormant Commerce Clause if it facially discriminates against out-of-state interests. *SDDS, Inc. v. South Dakota*, 47 F.3d 263, 267 (8th Cir. 1995) (statute may "'artlessly disclose an avowed purpose to discriminate'"). And even a "facially neutral measure" may violate the dormant Commerce Clause if it has "discriminatory purpose" or "discriminatory effect." *Id.* Such a law discriminating "against interstate commerce in favor of local business or investment is *per se* invalid," unless the state can demonstrate "under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 392 (1994). Legislative history is relevant to assessing discriminatory purpose. *See, e.g.*, *SDDS, Inc.*, 47 F.3d at 268 ("[T]he legislative history of the referred measure is brimming with protectionist rhetoric.").

118. Even if there is no discriminatory purpose or effect, a law still violates the dormant Commerce Clause when "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. And protectionism by definition is not a legitimate local interest. *Nat'l Pork Producers Council*, 598 U.S. at 372.

### B.    Act 624 Discriminates In Text, Purpose, And Effect

119. Far from establishing subtle barriers to interstate commerce, the legislators who crafted Act 624 "'artlessly disclosed'" the law's discriminatory purpose. *SDDS, Inc.*, 47 F.3d at 267. They did so in three different ways: through Act 624's express text, the drafting history that produced it, and through their persistent descriptions of the bill throughout its legislative history as a needed measure to protect in-state commerce.

120. *Text.* On its face, Act 624 repeatedly evidences the General Assembly's protectionist motives. The law's statement of "[l]egislative findings and intent" flatly declares that

44

Arkansas must protect "locally-operated pharmacies" from being driven "out of business." Act 624 § 1(a)(2). And the law's operative provisions carry forward that favoritism of in-state interests. As mentioned, pharmacies that are directly or indirectly owned by a PBM will be stripped of their retail "permit" in Arkansas—a term that Act 624 specifically redefines to "includ[e] a pharmacy permit for a mail-order pharmacy." *Id.* § 2(a)(1)(B). On information and belief, there are *no* mail-order pharmacies in Arkansas. Act 624's redefinition of that statutory term is thus designed to make clear that the law specifically applies to out-of-state pharmacies serving in-state patients. Additionally, the law codifies a special exception for *Arkansas* pharmacies and "pharmacy employers" with an interest in a PBM, so long as the pharmacy employer "is the sole Arkansas client" of the PBM and exclusively serves employees and dependents "in this state." *Id.* § 2(f)(1)-(3), to be codified at Ark. Code Ann. § 17-92-416(f)(1)-(3).

121. *Drafting History.* The text of Act 624 was carefully tailored through various amendments to ensure that its impacts fall on out-of-state interests. As originally drafted, H.B. 1150 not only would have barred permits to pharmacies directly or indirectly owned by PBMs, but also pharmacies affiliated with a "healthcare payor," which includes "[a]n entity that provides or administers a self-funded health benefit plan." Ark. Code Ann. § 23-92-503(3)(D). But legislators eventually realized that this language would have barred a large state employer from owning pharmacies. *See* Greg Geary, *Small pharmacies in danger of closing if PBM bill doesn't pass, state representative says*, White County Citizen (Mar. 27, 2025), https://tinyurl.com/mpc8nd89 (Senator Jonathan Dismang complaining that the "original version of the bill" would have barred a large state employer from owning pharmacies). Accordingly, Representative Moore introduced an amendment in February 2025 to remove references to a "healthcare payor," which the House

later adopted. *See* Amend. No. 1 to House Bill 1150 (Feb. 5, 2025), https://tinyurl.com/msbmasus. To underscore the law's insulation of in-state interests, Representative Moore later introduced a second amendment, which the House likewise adopted, establishing the aforementioned exception for pharmacies that are the "sole Arkansas client" of a PBM and that "[e]xclusively" serve employees and dependents "in this state." Amend. No. 2 to House Bill 1150 (Mar. 14, 2025), https://tinyurl.com/2w2emzs3.

122. *Legislative History.* Finally, Act 624's legislative history—both inside and outside of the General Assembly's chambers—brims with protectionist sentiments. On January 16, 2025, the bill's sponsors, various advocacy groups for local pharmacists, and the Attorney General held a press conference at the Arkansas State Capitol to announce H.B. 1150. In describing the need for the law, Representative Moore warned, "your neighborhood pharmacies are closing at a rapid pace." Arkansas Pharmacists Ass'n News Conference with Attorney General Tim Griffin at 8:00-8:03, YouTube (Jan. 16, 2025), https://tinyurl.com/mwtb5dzp. Representative Moore reiterated that concern days later on a podcast with "Pharmacists United for Truth and Transparency," when he explained, "supporting these independent pharmacies is really a big part of why we're running House Bill 1150." The PUTTcast, *Arkansas HB 1150: Combatting PBM Anticompetitive Practices with State Legislation*, at 2:24-2:32 (Feb. 5, 2025), https://tinyurl.com/3dnpa5ce.

123. Other legislators voiced the same concerns about protecting local interests in the run-up to legislative debates on the bill. Senator Mark Johnson deemed passage of Act 624 an "essential step" to "protecting local pharmacies." Mark Johnson, *Set the record straight on HB1150*, Arkansas Democrat Gazette (Mar. 2, 2025), https://tinyurl.com/5fnshhe6. Senator Dan Sullivan similarly explained that Act 624 would "protec[t] jobs" and "protec[t] local pharmacies" from PBM competition. Dan Sullivan, *HB1150 puts pharmacy patients, quality care first*,

46

Jonesboro Sun (Mar. 15, 2025, updated Apr. 16, 2025), https://tinyurl.com/43wks52p. And Representative Jim Wooten praised Act 624 as a bill that "really pinpoints and identifies the troublemakers causing the problem for your local pharmacists," *i.e.*, PBMs. Geary, *Small pharmacies in danger of closing if PBM bill doesn't pass, state representative says*, *supra*.

124.    Act 624's supporters echoed those protectionist themes at the General Assembly in committee debates on the proposal. Before the House, Representative Moore invited a representative of the Arkansas pharmaceutical lobby, John Vinson, to testify in support of the bill. Vinson extensively described how "unfair competition" from "out-of-state mail-order pharmacies" had purportedly resulted in the closure of in-state pharmacies, and thus that a consequence of Act 624 would be to "grow the economy locally" by shutting off such out-of-state competition. Vinson also noted that the large state employer previously covered by the original draft of the law would not be affected by—and in fact now supported—the bill as amended. Representative Richard McGrew likewise expressed concern for local pharmacies, asserting that competition from PBMs would "take them out of business." And Representative Robin Lundstrom asserted that without Act 624, "the small-town pharmacist … can't survive," warning that Arkansas may have to "close all our brick and mortars" due to competition from "mail-in pharmacies." Representative Carol Dalby wondered aloud whether such legislation would "not conflict with the Commerce Clause in the U.S. Constitution," to which Vinson responded that he is "not an attorney."

125.    Supporters reiterated the need to protect local interests through debates in the Senate. Bill sponsor Senator Kim Hammer began his presentation by declaring that "right now, pharmacy benefits managers, or PBMs, are steering patients to out-of-state mail-order pharmacies that they own or are affiliated with," undermining local independents. Vinson, testifying again before the Senate, opined that Act 624 would combat "PBM owned pharmacies out of state."

47

Another witness named Brandy Chane (herself a pharmacy owner) implored the Senate to "safeguard the future of independent community pharmacies." And Senator Mark Johnson castigated a witness, Randy Zook of the Arkansas Chamber of Commerce, for testifying against Act 624. Senator Johnson was "flabbergasted" at Zook's opposition to the bill and accused him of "lacking support [for] our local businesses." After the bill passed, the Arkansas Pharmacists Association duly issued a laudatory press release, explaining that Act 624 would ensure prescriptions are "delivered by trusted local pharmacists, not dictated by out-of-state corporations." *Arkansas Pharmacists Association Applauds Senate Committee Vote To Ban PBMs From Owning Pharmacies in State*, Ark. Pharmacists Ass'n (Apr. 8, 2025), https://tinyurl.com/yhkxe554.

126.    When Governor Sanders signed Act 624 into law, her accompanying press release also touted the protection of local interests. *See Sanders Signs Legislation to Ban Anti-Competitive PBM Practices*, Arkansas.gov (Apr. 16, 2025), https://tinyurl.com/mwpts25m. She claimed that PBMs "are attacking our state" and thus must be held "accountable." *Id.* Her press release also included congratulatory remarks from a number of supporters. Senator Justin Boyd, for example, praised the Governor for combatting PBMs' alleged efforts to steer prescription-drug fulfillment "away from Arkansas communities." *Id.* Representative Moore said the bill would achieve "justice" for "local pharmacies." *Id.* Vinson called the bill's enactment "a historic day" for "local pharmacies." *Id.* And an independent pharmacy owner deemed Act 624 "a win for local businesses." *Id.* As that avalanche of statements reflects, Act 624 inarguably has a discriminatory purpose.

127.    And Act 624's discriminatory purpose is carried out through its discriminatory effects. As explained, legislators carefully excised language about "healthcare payors" that would

48

have disabled a large employer in the state from owning pharmacies. The law instead targets PBMs alone—and, in so doing, codifies an outstanding proxy for out-of-state interests. The "Big 3" PBMs that bill supporters repeatedly criticized—CVS, Express Scripts, and Optum Rx—are all out-of-state companies. And the mail-order pharmacies that they operate are all located at out-of-state facilities. Indeed, on information and belief, Arkansas has *no* mail order pharmacies of its own. Act 624's practical effect is thus plainly to shift business away from out-of-state interests by stripping their pharmacy permits and shifting that business toward local, independent pharmacies—just as its supporters proclaimed.

128.   Act 624 is therefore "*per se* invalid" unless it can survive under "the 'strictest scrutiny'" and the aims it purportedly advances cannot be achieved through any "reasonable non-discriminatory alternatives." *S.D. Farm Bureau, Inc. v. Hazeltine*, 350 F.3d 583, 597 (8th Cir. 2003). That rigorous analysis dooms Act 624. The protectionist rationale the General Assembly endorsed is constitutionally forbidden, and the non-protectionist rationales it identified are pretextual, insubstantial, and can readily be achieved through non-discriminatory mechanisms (as existing Arkansas law already demonstrates).

129.   To draw attention away from the law's protectionist aims, the General Assembly also paid lip service to alternative, non-protectionist motivations, such as the claims that PBMs engage in "anticompetitive business tactics" by "inflating drug prices" and underpaying independent pharmacies through PBMs' role as "both a price setter and a price taker." Act 624 § 1(a)(2)-(3). But these purported alternatives are merely pretextual makeweights. The conduct the General Assembly accused PBMs of perpetrating is already illegal under Arkansas law. Act 900, enacted in 2015, requires PBMs to reimburse pharmacies at rates *at or greater* than what it costs pharmacies to acquire the drug. If a pharmacy believes that it was undercompensated, it can

49

initiate an administrative appeal to challenge reimbursement rates below the pharmacy's acquisition cost, Ark. Code Ann. § 17-92-507(c)(4)(A)(i)(b), and thus force PBMs to compensate the pharmacy to "at least the pharmacy acquisition cost," *id.* § 17-92-507(c)(4)(C)(i)(a)-(b). Similarly, Act 1, enacted in 2018, forbids a PBM from reimbursing "a pharmacy or pharmacist in the state an amount less than the amount that the [PBM] reimburses a [PBM] affiliate for providing the same pharmacist services," Ark. Code Ann. § 23-92-506(b)(2), or from reimbursing "a pharmacy or pharmacist for the ingredient drug product component of pharmacist services less than the national average drug acquisition cost or, if the national average drug acquisition cost is unavailable, the wholesale acquisition cost," *id.* § 23-92-506(b)(5)(A). Consistent with these pre-existing legal restrictions, Optum Rx already is required not to favor its own affiliates or reimburse them at higher rates than independent pharmacies. And the legislature heard testimony that PBMs more broadly were found to be in compliance with these provisions during the Arkansas Insurance Department's last audit. The General Assembly's non-protectionist rationales are weak and naked pretexts for its actual and impermissible protectionist motivation.

C.      **Act 624 Unduly Interferes With Interstate Commerce**

130.    Even setting aside the state's discriminatory and protection motives, Act 624 also contravenes the dormant Commerce Clause because "the burden [it] impose[s] on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. Burdens on interstate commerce are "not limited to the burdens suffered by the particular parties" in a suit, but instead must be assessed on an "aggregate" basis. *U & I Sanitation v. City of Columbus*, 205 F.3d 1063, 1069 (8th Cir. 2000).

131.    Act 624's purported "local benefits" are "illusory." *U & I Sanitation*, 205 F.3d at 1070. Of course, Act 624 yields substantial local benefits insofar as it protects local independent pharmacies from competition by out-of-state interests. But such protectionist motivations are

50

flatly impermissible, *Nat'l Pork Producers Council*, 598 U.S. at 372, and thus carry no weight in the analysis. And Act 624's remaining purported benefits are pretextual and insubstantial. The "anti-competitive conduct" with which Act 624 charges PBMs is already illegal under Arkansas law, and testimony before the legislature reflected that PBMs are in compliance with those restrictions. *See supra* ¶ 132. Moreover, the General Assembly's assertion that PBMs are nothing more than rent-seekers who both set and collect drug prices has no basis in reality. Indeed, researchers have repeatedly come to the opposite conclusion—that PBMs *enhance* competition and foster patient savings. *See supra* ¶¶ 43-45 (collecting studies). And mail-order pharmacies in particular—though "[u]nsurprisingly" a focus of attack "by retail pharmacies"—help "employers pay lower prices" for prescription drugs. *Id.*

132.    It is no wonder that the state's own consultants determined that Act 624 is likely to *reduce* pharmacy access and *increase* drug prices. As the General Assembly was considering the Act, the state's consultants at the Segal Group prepared a fiscal-impact statement assessing the law's likely effects. Because of the need to "restructure … pharmacy networks" solely toward independent pharmacies, Segal Group determined, Act 624 "may reduce pharmacy network access." Segal Financial Impact Statement (Mar. 17, 2025), https://tinyurl.com/4w6dxmpz. Moreover, Act 624 is likely to have a significant "cost impact" on specialty drugs, "as less competition would likely drive less favorable rates." *Id.* Accordingly, the General Assembly's view that it was advancing legitimate local interests rests on nothing.

133.    Conversely, the collective impacts on interstate commerce will be substantial—and vastly in excess of Act 624's nonexistent local benefits. In the "aggregate," *U & I Sanitation*, 205 F.3d at 1069, PBMs and their affiliated pharmacies, including Optum's, will lose hundreds of millions if not billions of dollars from a ban on their affiliated pharmacies' ability to serve

51

Arkansas patients.  *See* Complaint ¶ 154, *CVS Pharmacy, Inc. v. Ark. State Bd. of Pharm.*, No. 4:25-cv-524 (E.D. Ark. May 29, 2025), ECF 1 (estimating that CVS will lose more than $100 million "from asset impairment and annual loss of income"); *accord* Compl. ¶ 100, *Express Scripts, Inc. v. Richmond*, No. 4:25-cv-520 (E.D. Ark. May 29, 2025), ECF 1 (Express Scripts noting that Act 624 will inflict "an enormous and unrecoverable loss of business and goodwill"). And ERISA and Medicare plans will have to confront unprecedented inefficiencies and increased administrative and pharmaceutical costs from Act 624's novel mandate to comply with Arkansas-specific requirements.

134.    Finally, Arkansas plainly has "less burdensome alternative[s]" to achieve its purported goals than its novel, flat ban on PBM ownership of Arkansas-permitted pharmacies.  *U & I Sanitation*, 205 F.3d at 1070.  If the state *does* uncover specific instances of PBMs under-compensating independent pharmacies, then the Arkansas Insurance Department can take appropriate action under its existing laws, which already forbid that very conduct, *see supra* ¶ 129, and which render Act 624's destructive and disproportionate response superfluous.  Act 624 thus fails under *Pike* balancing as well.

## IV.    Act 624 Effects An Uncompensated Taking Of Private Property

135.    Finally, Act 624 should be enjoined because the law effects a taking of Optum's private property without any possibility of adequate compensation by the state.  The Fifth and Fourteenth Amendments forbid the government from forcing a property owner to sell its property at a loss, absent just compensation to ensure that the seller receives "the total value of the property when taken."  *Knick v. Twp. of Scott*, 588 U.S. 180, 190 (2019).  And they likewise forbid government regulations that severely impair the economic value of private property, despite investment-backed expectations to the contrary.  *See Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104 (1978).

52

136.    Act 624 does both.  With respect to Optum's eleven Genoa pharmacies located in Arkansas, Act 624 effectively requires fire sales of those pharmacies to third-party, non-PBM purchasers before the law's January 1 effective date.  There is no guarantee that Optum can even find a willing buyer before Act 624's effective date.  And even if purchasers can be found, depressed sale prices will inevitably result given the tight timeline in which those sales must be made.  No matter whether Optum's Genoa pharmacies are sold or shuttered, Act 624 will deprive Optum of revenue streams that it otherwise could have obtained in the law's absence.  Neither Act 624 nor any other provision of Arkansas state law provides adequate compensation for those certainly impending economic injuries.  Accordingly, an injunction is appropriate to restrain these "'future violations of the Takings Clause.'" *Pharm. Rsch. & Mfrs. of Am. v. Williams*, 64 F.4th 932, 950 (8th Cir. 2023).

## A.    Act 624 Effectively Requires Optum Rx To Divest From Its Pharmacies At A Loss

137.    Act 624 gives Optum a Hobson's choice with respect to its eleven brick-and-mortar Genoa pharmacies in Arkansas.  Optum either must sell off those pharmacies—if doing so is even possible—or it must simply shutter them, as they can no longer issue prescriptions to Arkansas patients.  In practical terms, then, Optum is *forced* to attempt a sale, lest those brick-and-mortar pharmacies' value be entirely lost.  Indeed, forcing such divestment was the General Assembly's avowed goal.  Senator Hammer, the bill's sponsor in the Senate, described Act 624's central purpose as "requiring a [PBM] to divest its pharmacy business" if the pharmacy is to continue serving Arkansans.

138.    Optum's forced divestiture from its eleven Genoa pharmacies will produce significant economic injuries.  Those pharmacies are multi-million-dollar assets with annual earnings running into the millions of dollars.  It will be impossible to recover their fair-market

53

value in forced sales occurring on compressed timelines to comply with Act 624's effective date. Indeed, a "to state the obvious, the potential buyer of an asset … has enormous leverage over the seller" when the purchaser "knows the seller must divest [an] asset quickly"—leading to "purchase price[s] … far lower" than what could be recovered under ordinary market conditions. *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 307 (D.D.C. 2020); *accord FTC v. Tempur Sealy Int'l, Inc.*, 2025 WL 617735, *1, *51 (S.D. Tex. Feb. 26, 2025) (same). Under these conditions, Optum's loss in forced sales will necessarily far out-strip the paltry, $15,000 compensation that Arkansas purports to provide under its general claims-compensation process. *See infra* ¶ 149.

**B.    Act 624's Divestiture Requirement Effects A *Per Se* Taking**

139.    Certain types of government interference with private-property rights constitute *per se* takings—meaning that the governmental action categorically requires the payment of just compensation. *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148 (2021). For example, when the government "takes title" to property, it categorically must provide just compensation. *Yee v. City of Escondido*, 503 U.S. 519, 522 (1992). And the same rule applies when the government requires a property owner to surrender its property to "a third party." *Cedar Point Nursery*, 594 U.S. at 148; *accord Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 n.9 (1982) (taking occurs when "authorized by state law … without regard to whether the State, or instead a party authorized by the State," receives the property).

140.    Act 624 effects just such a *per se* taking with respect to Optum's eleven Genoa pharmacies. Lest those pharmacies become defunct in Arkansas through the loss of their retail pharmacy licenses, Optum must attempt to sell them off to non-PBM-affiliated third parties. Optum, in other words, must surrender title to its private property pursuant to a government mandate. And in so doing, Optum will necessarily be unable to recover the full, fair-market value

of its pharmacies given the timeline and uncertainty posed by Act 624 and the "enormous leverage" any potential purchaser would exercise over Optum. *RAG-Stiftung*, 436 F. Supp. 3d at 307.

141.    In such cases of forced divestiture, the Supreme Court has recognized that the government must provide just compensation for the difference between the total value of the taken asset and the depressed value the property owner can obtain in a forced sale.  In the *Regional Railroad Reorganization Act Cases* ("*Blanchette*"), 419 U.S. 102 (1974), for example, the Supreme Court confronted a federal statute requiring railroads to sell railroad property to a state-incorporated private corporation, in exchange for securities in that private corporation (rather than cash), which the railroads contended were of little value.  *Id.* at 118, 137.  The Supreme Court concluded that "any deficiency" between the railroads' total value and "the value of the limited compensation provided under the Act indeed will be a taking of private property for public use." *Id.* at 154-55.

142.    So too here.  As a result of Act 624's forced-divestiture requirement, Optum necessarily will suffer a shortfall recovery from the depressed sale prices that will inevitably result. That "deficiency" represents "a taking of private property for public use," and thus must be compensated for Act 624 to comply with the Fifth and Fourteenth Amendments.  *Blanchette*, 419 U.S. at 154-55.

C.    **Act 624's Divestiture Requirement Also Effects A Regulatory Taking**

143.    Alternatively, Act 624 also effects a regulatory taking with respect to those brick-and-mortar pharmacies.  Regulations that merely affect the value of private property do not *categorically* constitute takings, but they may nonetheless constitute takings when they run afoul of the three-factor test laid down by the Supreme Court in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978).  To determine whether a regulatory taking has occurred, courts must "balance three factors: (1) the 'economic impact of the regulation on the claimant;' (2) 'the

55

extent to which the regulation has interfered with distinct investment-backed expectations;' and (3) 'the character of the governmental action.'" *Height Apartments, LLC v. Walz*, 30 F.4th 720, 734 (8th Cir. 2022) (quoting *Penn Cent. Trasp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)). "In discerning whether a taking has occurred, the first two factors are the main determinants, and 'the third "may be relevant.""" *Id.* Here, all three factors establish that the threatened divestiture under Act 624 would constitute a regulatory taking.

144.    *First*, the economic impact of Act 624's divestiture requirement on Optum would be severe. As described above, Optum cannot possibly recover its pharmacies' full, multi-million-dollar value as a result of forced sales to comply with H.B. Act 624's implementation date. Beyond simply that deficiency, Optum would stand to lose millions of dollars in the future from lost revenue streams directly attributable to the loss of its Genoa pharmacies—particularly if those locations become defunct in the event a qualified buyer cannot be found. *See Heights Apartments, LLC*, 30 F.4th at 734 (lost "income" plausibly established first *Penn Central* element). Moreover, these losses would be "placed disproportionately on a few private property owners." *Cienega Gardens v. United States*, 331 F.3d 1319, 1338 (Fed. Cir. 2003). By design, the law is specifically targeted at PBMs that own pharmacies serving Arkansas.

145.    *Second*, Act 624 severely interferes with investment-backed expectations. For years, Optum has structured its affairs on the assumption that its Genoa pharmacies will be able to serve patients in Arkansas. That assumption has formed the basis of new investments in drug-production capacity, expenditure of compliance costs associated with the procurement of Arkansas licenses, representations to investors, and projections of expected revenue streams. Moreover, Optum could not have reasonably anticipated a law like Act 624 when it engaged in the actions creating those reliance interests. As Governor Sanders herself recognized in signing the bill,

Arkansas "will be the first [State] in the country" to adopt such a law. *Sanders Signs Legislation to Ban Anti-Competitive PBM Practices*, *supra*; *cf. Heights Apartments, LLC*, 30 F.4th at 734 (finding taking plausibly alleged where "no landlord could have reasonably expected regulations of the duration and extent present in the E[xecutive] O[rders].").

146.    *Third*, the "character of the governmental action" likewise indicates that Act 624 effects a taking. "In certain instances, the Supreme Court has found that a regulation's effects are so publicly beneficial that the regulation 'does not constitute a taking.'" *Heights Apartments, LLC*, 30 F.4th at 734. A "broadly beneficial" regulation is less likely to be a taking, whereas a regulation that "directly benefit[s] only some" does not implicate "widespread interests" and is thus more likely to be a taking. *Id.* at 735. Moreover, "[w]eighty public interests alone" do not transform a taking into a "permissible regulation." *Becker v. City of Hillsboro*, 125 F.4th 844, 859 (8th Cir. 2025). Here, the General Assembly's purported interests in patient choice and cost control were simply pretext for legislators' repeatedly disclosed protectionist motives. Accordingly, while "the government interest" must be taken into account under *Penn Central*'s third prong, that interest here is largely illegitimate. *Becker*, 125 F.4th at 859. Moreover, even if Act 624's assertions about affordability and patient choice were taken at face value, the law "benefit[s] only some" Arkansans—those who happen to have less choice or pay more as a result of acquiring prescriptions from a pharmacy owned by a PBM. *Heights Apartments, LLC*, 30 F.4th at 735. But many if not all Arkansans substantially *benefit* from PBM-pharmacy vertical integration. Thus, Act 624 at best benefits only a discrete segment of the population, and such underinclusion supports finding a regulatory taking.

**D.    Because Arkansas Provides No Adequate Mechanism For Just Compensation, Enjoining Enforcement Of Act 624 Is Necessary**

147.    While the default remedy for an unconstitutional taking is money damages, *Knick*, 588 U.S. at 202, an injunction to restrain a threatened taking is appropriate when there is no adequate remedy at law available to provide just compensation if the taking were to occur, *Williams*, 64 F.4th at 950. Here, there is no adequate remedy at law because Arkansas has authorized only limited compensation for a takings claim, and that compensation falls short of the relief to which Optum is entitled.

148.    By default, sovereign immunity bars any action for money damages against the Arkansas General Assembly or the Arkansas State Board of Pharmacy except to the extent that the state has waived sovereign immunity by consenting to suit. The General Assembly and Pharmacy Board are arms of the State of Arkansas and thus have Eleventh Amendment immunity from any claim for money damages in federal court. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989); *accord Williams*, 64 F.4th at 949 n.13 (noting that States enjoy sovereign immunity from takings claims in federal court). Nor is there any money-damages remedy available in a state-court suit. Article 5, Section 20 of the Arkansas Constitution provides that the State of Arkansas has immunity from money-damages claims, and the Supreme Court of Arkansas has confirmed that this provision bars money damages for takings claims against state agencies. *See Austin v. Ark. State Highway Comm'n*, 895 S.W.2d 941, 944 (1995).

149.    Arkansas has nonetheless provided a mechanism for obtaining compensation for takings that involve small amounts of money, but that mechanism is plainly inadequate under Eighth Circuit precedent. In principle, the Arkansas State Claims Commission entertains takings claims against the state, *see Austin*, 895 S.W.2d at 943, but such awards are capped by statute at $15,000 unless the General Assembly both (1) approves a higher award and (2) enacts an

appropriation to pay it, *see* Ark. Code Ann. § 25-44-215(b). Here, Optum's damages from liquidating multi-million-dollar assets on a mandatory, compressed timeline would far exceed that paltry $15,000 amount. And there are good reasons to question whether the same General Assembly that overwhelmingly enacted Act 624 would approve an appropriation to remedy a taking under that same law. In any event, navigating the Claims Commission process plainly is not as "practical," "efficient," and "prompt" a remedy as an injunction, and thus is inadequate under circuit precedent. *Williams*, 64 F.4th at 942-43. Accordingly, an injunction to restrain the "future violations of the Takings Clause" threatened by Act 624 is necessary and appropriate. *Williams*, 64 F.4th at 950.

## CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF

### COUNT I
### (ERISA Preemption)
### (against all Defendants)

150. Plaintiffs incorporate the above allegations by reference.

151. Act 624 is preempted by ERISA. ERISA expressly preempts state laws that interfere with national uniformity in plan administration or that regulate matters central to plan administration. Act 624 does both. Rather than permitting plans to deliver benefits in a nationally uniform fashion through use of PBM-affiliated pharmacies, plans with beneficiaries who fill prescriptions in Arkansas will instead need to negotiate new, good-for-Arkansas-only contracts to ensure that prescriptions are filled through independent pharmacies. And how plans choose to structure their pharmacy networks is a central matter of plan administration.

152. Act 624 therefore is preempted by ERISA, 29 U.S.C. § 1144, and thus is invalid under the Supremacy Clause, U.S. Const. art. VI cl. 2.

59

**COUNT II**
**(Medicare Preemption)**
**(against all Defendants)**

153.    Plaintiffs incorporate the above allegations by reference.

154.    Act 624 is preempted by the Medicare Modernization Act. Under that Act, the statutory provisions and regulations established under Medicare Part D and MAPD expressly preempt any state law or regulation "with respect to" those plans. At minimum, Act 624 operates "with respect to" Medicare Part D and MAPD plans because it conflicts with and encroaches upon the federal standards governing these plans. Act 624 does not fall within either of the statutory exceptions to the express preemption provision. In addition, Act 624 frustrates the purposes of the standards governing Medicare Part D and MAPD plans.

155.    Act 624 therefore is preempted by the Medicare Modernization Act, 42 U.S.C. § 1395w-101 *et seq.*, and thus is invalid under the Supremacy Clause, U.S. Const. art. VI cl. 2.

**COUNT III**
**(Dormant Commerce Clause)**
**(against all Defendants)**

156.    Plaintiffs incorporate the above allegations by reference.

157.    Act 624 is invalid under the dormant Commerce Clause. The dormant Commerce Clause forbids state laws that discriminate against interstate commerce on their face or in their purpose and effect, as well as state laws that unduly burden interstate commerce in relation to their putative local benefits. Act 624 discriminates against out-of-state PBMs and mail-order pharmacies on its face, and the bill's drafting and legislative history confirm that the General Assembly's intent was to specially disable out-of-state pharmacies to reduce competition and protect in-state, local pharmacies. Moreover, Act 624's purported in-state benefits are either impermissible (protectionism) or pretextual (cost control and protection of patients), and can readily be achieved consistently with the Constitution by enforcing extant laws. Act 624's illusory

local benefits thus cannot overcome the severe economic burdens the law will impose from depriving an entire industry of access to Arkansas.

158.    Act 624 is therefore invalid under the dormant Commerce Clause.

**COUNT IV**
**(Takings Clause)**
**(against all Defendants)**

159.    Plaintiffs incorporate the above allegations by reference.

160.    The Fifth and Fourteenth Amendments proscribe state legislation that takes private property for public use without the provision of just compensation.  In particular, they bar *per se* takings (where the government forces divestiture at a loss) as well as regulatory takings (where the government severely diminishes private property's value, despite investment-backed expectations to the contrary).  Act 624 effects a *per se* taking by forcing Optum to divest at a loss from its eleven brick-and-mortar pharmacies in Arkansas.  And the law likewise effects a regulatory taking by impairing and potentially destroying the value of those eleven pharmacies.  Moreover, adequate compensation is unavailable for these impending economic injuries.

161.    Act 624 is thus invalid under the Takings Clause of the Fifth Amendment, as incorporated against the states by the Fourteenth Amendment.

**PRAYER FOR RELIEF**

162.    Plaintiffs pray that this Court:

    a.    Declare that Act 624 is preempted under ERISA;

    b.    Declare that Act 624 is preempted under Medicare statutes and regulations;

    c.    Declare that Act 624 unconstitutionally discriminates against out-of-state commerce and unconstitutionally burdens interstate commerce in excess of putative local benefits, and thus is invalid under the dormant Commerce Clause;

    d.    Declare that Act 624 unconstitutionally effects *per se* and regulatory takings of private property for public use without just compensation, and thus is invalid under the Takings Clause.

    e.    Issue preliminary and permanent injunctions prohibiting Defendants from implementing, administering, acting upon, or enforcing Act 624 against Plaintiffs;

    f.    Award Plaintiffs costs and reasonable attorneys' fees as appropriate; and

    g.    Grant Plaintiffs such further and other relief as this Court deems just and proper.

Dated:  June 16, 2025

Respectfully submitted,

_____
Peter Shults (Ark. Bar No. 2019021)
Amanda G. Orcutt (Ark. Bar No. 2019102)
SHULTS LAW FIRM LLP
200 West Capitol Avenue
Suite 1600
Little Rock, AR  72201
Telephone: (501)-375-2301
pshults@shultslaw.com
aorcutt@shultslaw.com


/s/ Allyson N. Ho
Allyson N. Ho  (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
Telephone: (214) 698-3100
aho@gibsondunn.com

Geoffrey M. Sigler  (*pro hac vice* forthcoming)
Matthew S. Rozen  (*pro hac vice* forthcoming)
Clare F. Steinberg  (*pro hac vice* forthcoming)
M. Christian Talley  (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500
gsigler@gibsondunn.com
mrozen@gibsondunn.com
csteinberg@gibsondunn.com
ctalley@gibsondunn.com

*Attorneys for Plaintiffs*